```
1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
                                         : 13-22050 (RDD)
4    In re:
                                         : 300 Quarropas Street
5        ROMAN SLEDZIEJOWSKI,            : White Plains, New York
                                         :
6                 Debtor.                : November 20, 2015
     ------------------------------------X
7    O'TOOLE AS CHAPTER 7 TRUSTEE,       :
                                         :
8                         Plaintiff,     :
                                         : Adv. No. 13-08207 (SHL)
9               v.                       :
                                         :
10   MYPLACE DEVELOPMENT, et al.,        :
                                         :
11                       Defendants.     :
     ------------------------------------X
12   In re:
                                         : 13-22748 (RDD)
13       INNOVEST HOLDINGS, LLC,         :
                                         :
14                Debtor.                :
     ------------------------------------X
15   O'TOOLE, CHAPTER 7 TRUSTEE OF THE   :
     ESTATE,                             :
16
                          Plaintiff,     :
17                                       : Adv. No. 15-08208 (SHL)
                v.                       :
18                                       :
     MYPLACE DEVELOPMENT, et al.,        :
19                                       :
                         Defendants.     :
20   ------------------------------------X
     O'TOOLE, CHAPTER 7 TRUSTEE OF THE   :
21   ESTATE,                             :
                                         :
22                        Plaintiff,     :
                                         : Adv. No. 15-08273 (SHL)
23              v.                       :
                                         :
24   MYPLACE DEVELOPMENT, et al.,        :
                                         :
25                       Defendants.     :
     ------------------------------------X

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

1                                                                    2

2

3              TRANSCRIPT OF DOCUMENT #22 MOTION TO DISMISS
                          ADVERSARY PROCEEDING
4                 BEFORE THE HONORABLE SEAN H. LANE
                    UNITED STATES BANKRUPTCY JUDGE
5

6       APPEARANCES:

7

8       For the Trustee:            NICHOLAS R. RIGANO, ESQ.
                                    JOSEPH S. MANISCALCO, ESQ.
9                                   Lamonica, Herbst & Maniscalco, LLP
                                    3305 Jerusalem Avenue
10                                  Wantagh, New York 11793

        Chapter 7 Trustee:          MARIANNE T. O'TOOLE, ESQ.
11                                  Marianne T. O'Toole, LLC
                                    22 Valley Road
12                                  Katonah, New York 10536

13

        For the Non-John Doe        DAVID NEIER, ESQ.
14      Defendants:                 Winston & Strawn, LLP
                                    200 Park Avenue
15                                  New York, New York  10166

16

17      Court Transcriber:          RUTH ANN HAGER, C.E.T.**D-641
                                    TypeWrite Word Processing Service
18                                  211 N. Milton Road
                                    Saratoga Springs, New York 12866
19

20

21

22

23

24

25

3

1  (Proceedings began at 11:00 a.m.)

2        THE COURT:  So everybody is here for the 11:00

3  o'clock matters, which are -- involve adversary proceedings in

4  two Chapter 7 cases:  Roman Sledziejowski and Innovest

5  Holdings, LLC.  I know we have a motion, at least we -- some

6  things on that we're going to have hearings on, but I thought

7  what I'd first to is get appearances from everybody and then

8  get a status of where things are generally.

9        So let me get appearances starting this side of the

10  room and going that way.

11        MR. NEIER:  Good morning.  David Neier and M. K.

12  Turner on behalf of the named non-John Doe defendants, I guess

13  is the best way to say it.

14        THE COURT:  All right.

15        MR. NEIER:  In the adversary proceedings.

16        THE COURT:  Thank you.

17        MR. RIGANO:  Good morning, Your Honor.  Nicholas

18  Rigano from Lamonica Herbst& Maniscalco, the Chapter 7

19  Trustee.

20        MR. MANISCALCO:  Good morning, Your Honor.  Joseph

21  Maniscalco, Lamonica Herbst & Maniscalco on behalf of the

22  Trustee.

23        MS. O'TOOLE:  Good morning, Your Honor.  Marianne

24  O'Toole, the Trustee.

25        THE COURT:  All right.  Good morning to you all.

4

1   Please be seated.

2          So maybe you could give me just anything else that

3   we should discuss before we get to the actual motion that we

4   need to address or is there nothing else?

5          MR. RIGANO:  Your Honor, I think there is one

6   housekeeping matter that's been addressed --

7          THE COURT:  All right.

8          MR. RIGANO:  -- that we've asked come back from

9   yesterday.  There were actually two adversary proceedings that

10  were initially commenced by the Chapter 7 Trustee, hence, the

11  two defendants --

12         THE COURT:  Right.

13         MR. RIGANO:  Two of those adversary proceedings

14  we're doing them today and the third related to a single

15  transfer made by Innovest, fraudulent transfer actions arising

16  therefrom.

17         Initially the named defendants filed a motion to

18  dismiss where the Trustee amended the complaint to answer

19  those defendants' needs to adversary proceedings that were on

20  today.  When amending Trustee's complaint Trustee included

21  that single transfer in the complaints here today.

22         THE COURT:  All right.

23         MR. RIGANO:  And so it's -- the same causes of

24  action it set forth in that third complaint are at issue in

25  the complaints that were --

5

1            THE COURT:  All right.  So is there an intent to

2    drop that case or is it just to follow form with whatever

3    happens in these meetings?

4            MR. RIGANO:  Well, the named defendants filed a

5    motion to dismiss in that case as well.  As contemplated by

6    the parties that motion to dismiss will be adjourned.

7    However, as Your Honor's decision here today, somehow it

8    impact a sole transfer, which we call the Innovest transfer in

9    this case at that decision, which would also affect that

10   adversary proceeding as well.

11           THE COURT:  All right.  And that's the transfer to

12   Innovest?

13           MR. RIGANO:  No, the transfer made by Innovest --

14           THE COURT:  Transfer made --

15           MR. RIGANO:  -- and MyPlace Development in the

16   amount of 1.3 million dollars.

17           THE COURT:  Ah, I gotcha.  Okay.  All right.  That's

18   fine.  And is that the 15-8273 adversary?

19           MR. RIGANO:  Yes, Your Honor.

20           THE COURT:  All right.  So I'll consider that

21   adjourned for today.  Does that make sense from defendant's

22   counsel's point of view?

23           MR. NEIER:  Yes, Your Honor.  We think it's so that

24   the request [indiscernible].

25           THE COURT:  All right.  Yeah, it's fine.  Obviously,

6

1   whatever happens here is -- to the extent that they are the

2   same issues somewhere else, I would -- I think everyone

3   expected it to be the same result.  So it makes sense to not

4   worry about it, at least for purposes of today.

5          So that leaves the motions that are filed in these

6   two cases which are on for argument today, right?

7          MR. RIGANO:  That's right, Your Honor.

8          THE COURT:  All right.  So it is defendant's motion

9   and so I will -- let me hear from them first.  And let me just

10  say, I think I have a sense of the transactions, so I just --

11  I just want to make -- there are a couple of things that would

12  be helpful to hear about is there's some discussion about

13  what's challenged and what's not challenged.

14         And as far as I can tell, there's sort of three

15  transactions at issue here.  There's some background, which is

16  the ownership in the MyPlace entity, which I guess is two

17  entities, but it's referred to as MyPlace and it's defined as

18  two, and then there's Innovest loan and money to MyPlace, and

19  there's the three transactions that I understand to be part of

20  this series of allegations that Mr. Sledziejowski transferred

21  an equity interest to Kulczyck Real Estate Holdings for sort

22  of a nominal sum; that TWSIP, I don't know if we're going to

23  refer to them as that or TWS Investment Partners, assigned

24  rights under the loan to Kulczyck Real Estate Holdings, and

25  that was -- those -- both those transactions happened

7

1   December 3rd of 2009; and then there was Kulczyck Real Estate

2   Holdings paying Innovest 50 percent of the outstanding loan

3   balance and that actually occurred, according to the

4   allegations, December 7, 2009.

5           So it's -- there's some difference.  I couldn't

6   quite figure out as to who paid that, whether it was Kulczyck

7   Investments or which I think is -- was Kulczyck -- another

8   Kulczyck entity, Kulczyck Holdings.  I think there seems to be

9   some daylight between the two parties on that, but I don't --

10  I mean, so it would be helpful, one, is if I got any of the

11  background wrong, please straighten me out.  I just wanted to

12  lay it out to express what I -- my understanding is of what

13  the facts are.

14          And two is, there was some discussion about what's

15  challenged, what's not challenged as part of the case, so

16  would appreciate some clarity on that issue.  And then when we

17  get into personal jurisdiction, obviously there are a number

18  of defendants and it'd be helpful to talk about the contacts

19  and the activities defendant by defendant and if there's any

20  attempt to -- or thought that it's appropriate to aggregate

21  contacts to explain how that works, what contacts are being

22  aggregated for who, why, and what's the basis for that.

23          And then I think the other issues are set out in the

24  complaint.  Obviously, whatever you want to tell me.  I think

25  the other big issue, safe harbor was to whether this was a

8

1 settlement payment, which I think has to go with what's

2 challenged or not challenged, but -- so those are some of the

3 things I was thinking about.  It probably comes as no surprise

4 to any of you and so with that, let me hear from defendant's

5 counsel.

6 　　　　　MR. NEIER:  Yes, Your Honor.  Give me one second.

7 Let me [indiscernible].

8 　　　　　So in terms of the number of transactions, I don't

9 think there actually is a factual disagreement.  There was a

10 loan, which is written in Polish, but we've provided an

11 English translation of the loan, made by TWSIP to the MyPlace

12 entities.  The loan was made in three tranches and each one of

13 those tranches was then assigned to the KREH entity in one

14 transaction, even though it's written in three agreements

15 because it was written think an assignment agreement for each

16 one of the tranches of the loan and one wire transfer was made

17 in respect to all three tranches.

18 　　　　　And then the second transaction, which Your Honor

19 referred to, is the sale of the equity which -- is that

20 Mr. Sledziejowski's personal investment?  It was a 25 percent

21 equity investment that was then transferred.

22 　　　　　MR. RIGANO:  That's correct.

23 　　　　　MR. NEIER:  Per -- and I think the -- I think we can

24 take a -- as a given that 2,500 zlotys is not worth very much.

25 　　　　　THE COURT:  All right.

9

1          MR. NEIER:  So, Your Honor, we think a lot of the

2   complaint has factual inaccuracies and really doesn't go to

3   the heart of this matter.  But I think if you parse through

4   the complaint it's what we just talked about.  It's the

5   allegations that TWSIP made loans to MyPlace.  Now, those

6   loans are debt and equity investments in MyPlace.  They're not

7   property of the -- MyPlace does not have any property interest

8   that -- in respect to the debtor.  If this was under the

9   Bankruptcy Code, this would be pretty easy because, of course,

10  under the Bankruptcy Code the debtor could only sue for

11  property interests of the debtor and an investment in an

12  entity for any kind of debt in equity investments in an entity

13  is not property of the estate.

14          What's property of the estate is the equity and debt

15  investment, not anything involving the entity itself.  So we

16  don't think that MyPlace could be a proper defendant, no

17  matter what you do, because it's not a property interest of

18  the estate.  But that's just speaking as a bankruptcy lawyer.

19          So there are these debt and equity investments that

20  are made in Polish real estate and development companies.  In

21  2009 TWSIP and Mr. Sledziejowski decided to liquidate their

22  investments.  TWSIP liquidates its debt investments and

23  Mr. Sledziejowski liquidates his 25 percent equity interest in

24  the MyPlace entities.  They do so to a Polish investment

25  company, Polish real estate investment company, in agreements

10

1   governed by Polish law.  So the original investments were --

2   in reading the complaint in Polish farmland with the idea that

3   that Polish farmland would be re-zoned and developed and

4   developed into residential housing.  And those agreements were

5   governed by Polish law exclusively and they were in Polish and

6   it was just an investment by a U.S. entity, if you will, in

7   Poland.  The transfer of those -- or the assignment of those

8   investments was made in 2009 and the Trustee believes that

9   they were for less than fair consideration.

10         Now, we challenged the jurisdiction of the

11  complaint.  The Trustee then amended the complaint.  We

12  accepted service of the complaint just for the purpose of

13  challenging personal jurisdiction, but we figured for the

14  Court's convenience, for the Trustee's convenience we would

15  challenge the entirety of the complaint at this juncture, just

16  to make it easy for everybody.

17         With respect to personal jurisdiction, I think the

18  Court is well aware of the tests from the Arcapita case, which

19  while different facts is essentially the same law.  And I

20  don't think there's a disagreement with the Trustee as to the

21  applicable law.  If there's a disagreement, it's the

22  application of the facts to the law.

23         So the test is for personal jurisdiction that there

24  must be minimum contacts, minimum contacts can be established

25  by general jurisdiction or specific jurisdiction and then

11

1    after that the Court makes a second inquiry as to whether it's

2    reasonable for the Court to exercise personal jurisdiction

3    over the defendants.

4           Here, there are a lot of allegations in the

5    complaint about general jurisdiction, but the Trustee has

6    conceded in opposition to the motion to dismiss that there is

7    no general jurisdiction and we look at specific jurisdictions.

8    So all these allegations about the fact that

9    Mr. Sledziejowski -- or the allegations that Mr. Sledziejowski

10   and Mr. Kulczyck were friends, that they grew up together in

11   Poland, that they socialized together, that Mr. Kulczyck's

12   wife was friends with Mr. Sledziejowski in Poland, none of

13   that really matters for specific jurisdiction.

14          With respect to specific jurisdiction, you look at

15   other suit-related conduct and whether the parties personally

16   availed themselves of the jurisdiction of the U.S. and that --

17   that's not just the defendants who allege that that's the

18   correct law; it's the Trustee who alleges that.

19          So the Trustee says in their opposition that the

20   defendants -- and I'm reading from page 7 of their

21   opposition -- the defendants' suit-related conduct with the

22   forum must form the basis for specific jurisdiction.  And then

23   they have a quote from the -- from one of the Madoff cases:

24          "Specific personal jurisdiction exists where a

25      foreign defendant personally directs his activities at

12

1      residents of the forum and the underlying cause of action

2      arises out of those -- arises out of or relates to those

3      activities.  Where the claim arises out of or relates to

4      the defendants' contacts with the forum, i.e., specific

5      jurisdiction it asserted, minimum contacts necessary to

6      support such jurisdiction exists where the defendant

7      purposely availed itself of the privilege of doing

8      business in the forum and could foresee being hailed into

9      the court there."

10   And that's from page 7 of the Trustee's opposition and we

11   would agree that that is the correct statement.

12        Here, other transactions which the Trustee alleges

13   occurred, including investments in the pension account, their

14   friendship, other allegations which while we didn't submit

15   affidavits in opposition to the allegations, which we could do

16   on a personal jurisdiction motion to dismiss, but we are

17   relying on the facts that's alleged in the complaint, there

18   are a lot of incorrect facts.  They seem to be confusing.

19   Mr. Kulczyck's -- Mr. Kulczyck with his father, who actually

20   died of complications of surgery between the time of the

21   original complaint and the amended complaint.  So when you

22   look at specific jurisdiction, that is the suit-related

23   conduct that indicates that the defendants purposely availed

24   themselves of this forum, you have very little.

25        With respect to the MyPlace defendants there are no

13

1   allegations that they had any contact with this forum.

2   Rather, it's Mr. Sledziejowski and TWSIP who make investments

3   in those entities overseas.  With respect to the Kulczyck

4   Investments, and Your Honor asked something about Kulczyck

5   Investments, there are no allegations.  The only allegation is

6   that -- and I believe it's in the opposition brief that on the

7   website Kulczyck Investments is listed as a parent company.

8           With respect to --

9           THE COURT:  A parent company of who?

10          MR. NEIER:  I believe it's KH is what the -- it's a

11  footnote in the -- I believe it's page 12 of the brief.  Yeah.

12  So page 12, footnote one, it says, "While" -- it says, "While

13  defendant Kulczyck Investments was not a named party to the

14  agreements, for the purposes of personal jurisdiction the

15  actions of an agent may be attributed to the principal.

16  According to defendant's Kulczyck Investments' website,

17  defendant Kulczyck Investments is the parent of KREH.

18          THE COURT:  All right.

19          MR. NEIER:  That's the allegation.  And I believe

20  it's in the opposition brief, not in the complaint.  So there

21  are no allegations as to MyPlace.  There are no allegations as

22  to Kulczyck Investments.

23          With respect to KREH, KREH is alleged to be a Polish

24  real estate company which makes investments in Polish and in

25  central and eastern European real estate and that it entered

14

1  into equity debt investments with TWSIP, which is a U.S.-based

2  entity or a dissolved U.S.-based entity.

3         With respect to KH or Kulczyck Holdings, the

4  allegation is that they wire -- and I think you were asking

5  about the wire transfer, Your Honor -- the allegation is that

6  Kulczyck Holdings wired funds on behalf of KREH to the U.S.,

7  to the Bank of America account of TWSIP.  I'm sorry.  That's

8  not correct.  To the bank account of Innovest for the benefit

9  of TWSIP and that's from the wire transfer, which I believe

10 was submitted before Your Honor as part of the affidavit in

11 support of the motion to dismiss.

12        With respect to Mr. Kulczyck, there are really very

13 few allegations that are specific jurisdiction related as

14 suit-related conduct indicating that they purposely availed

15 themselves in the forum.

16        The only allegation is that there were a couple of

17 emails sent between -- and we don't have the full text of the

18 emails.  The emails were not submitted, they're not attached

19 to the complaint.  We don't know in what context they were

20 made.  We don't know if the quotes are accurate or whether

21 they've been ellipsized in some manner.  But the allegation is

22 that they had two emails between Mr. Kulczyck and

23 Mr. Sledziejowski in negotiating the agreement.  Obviously you

24 can access an email account from anywhere in the world, so

25 it's not evidence that Mr. Sledziejowski was in the United

1  States and it's not evidence that Mr. Kulczyck was in the

2  United States.  It's just an allegation that they had an email

3  exchange.

4           From our standpoint, those facts, that is the actual

5  facts that related to suit-related conduct here in the United

6  States, are insufficient as a matter of law to establish

7  personal jurisdiction under the first test, which is general

8  and specific or the two-part inquiry.  The first inquiry is

9  minimum contacts.  We don't believe there are minimum

10 contacts.  The Trustee has conceded that there's no general

11 jurisdiction.  With respect to specific jurisdiction the only

12 allegations are the ones that we've outlined.  We don't

13 believe those constitute minimum contacts under the specific

14 jurisdiction inquiry.

15          The second part of the test is whether or not it's

16 reasonable for the Court to exercise personal jurisdiction

17 here and these are investments in Polish real estate pursuant

18 to agreements with a Polish entity governed by Polish law made

19 by TWSIP.  And then we have the assignment of those

20 investments, the debt and equity investments to KREH, which is

21 alleged in the complaint to be a Polish real estate

22 development company, investment company doing business in

23 Poland, making investments in Poland, eastern and central

24 Europe governed by Polish law.

25          What happened here is that it is the Trustee's

16

 1   debtors, that is, TWS -- well, it's -- TWSIP is not a debtor

 2   but it is the parent company of TWSIP and Mr. Sledziejowski

 3   who availed themselves of the laws of Poland and availed

 4   themselves of the jurisdiction of Poland, not the other way

 5   around.  It's not the defendants here who availed themselves

 6   of the jurisdiction of the U.S.  This is simply a U.S. entity

 7   that made investment that turned south in 2009 and they

 8   decided to liquidate that investment to a Polish entity, so

 9   it's a Polish investment liquidated to a Polish entity.

10        The fact that there was a wire transfer here in the

11   United States, which the Trustee later disavows as part of

12   their allegations of their complaint, and the fact that the

13   investment was for less than fair consideration does not

14   establish suit-related conduct here in the United States or

15   that the defendants purposely availed themselves of the forum

16   here in this jurisdiction.

17        I don't know how the judge -- how Your Honor wants

18   to handle this.  Do you want us to go on and talk about the

19   remainder of the complaint?

20        THE COURT:  Yeah.  I would do that.  Let me ask you

21   about the -- there's some discussion about the mere department

22   doctrine and you made the point that there's no allegation of

23   alter ego.  Certainly it seems under everyone's understanding

24   of the facts that certain parties are acting on behalf of

25   other parties.  So, in your view, is it appropriate to

17

1   aggregate any conduct of some of the entities, some of the

2   defendants in terms of understanding and assessing personal

3   jurisdiction?  So, for example, you have this -- I think

4   everyone says it's essentially -- you say it's two

5   transactions; they say it's three, but it -- I think we all --

6   we all know what they are.

7           MR. NEIER:  Whether it's a series of transaction --

8           THE COURT:  Yeah.

9           MR. NEIER:  -- or one transaction --

10          THE COURT:  Yeah.  It's -- well, you say it's -- two

11  of them are the flip side of the --

12          MR. NEIER:  Right.

13          THE COURT:  -- same transaction.  Again, but

14  there -- everyone agrees to what they are.

15          MR. NEIER:  Right.

16          THE COURT:  So, for example, KREH --

17          MR. NEIER:  And they all occur in the same day at

18  the same time.

19          THE COURT:  Right.  So KREH seems to be the party to

20  the transaction, the actual named party.

21          MR. NEIER:  That's the counter-party.

22          THE COURT:  The counter-party.  But at the same time

23  there are emails from Mr. Kulczyck that certainly appear to

24  relate to the actual transaction.  Putting aside whether they

25  actually do anything for the -- for personal jurisdiction, I'm

18

1   just trying to figure out whether -- so they seem to relate to

2   these transactions and then there also seems to be a payment

3   that's made and it appears to be Kulczyck Holdings and that's

4   the payment down for what is called Kulczyck Investment.

5   Again, I'm a little confused about that.

6           But what -- an entity other than KREH makes the

7   payments.

8           MR. NEIER:  Kulczyck Holdings on behalf of -- is the

9   allegation of the complaint, Kulczyck Holdings.

10          THE COURT:  On behalf of KREH?

11          MR. NEIER:  Correct, Your Honor.

12          THE COURT:  So -- and that's the seven million

13  dollars.  So just looking at what everybody says is undisputed

14  does it make sense, and if so -- if not, why not, to aggregate

15  the actual transaction that the transfer of the money and the

16  emails for purposes of understanding specific jurisdiction.

17          MR. NEIER:  Well, first of all, Your Honor, the

18  Trustee actually states in their opposition brief that they

19  don't have sufficient evidence to make out the mere department

20  allegation and they're requesting discovery to try and make

21  out the mere department allegations.  So they don't believe

22  that they have sufficient evidence to -- or a sufficient basis

23  to make the mere department allegations.

24          THE COURT:  Well, let me just put it aside for --

25  let me put that -- set that --

19

1          MR. NEIER:  Well, our --

2          THE COURT:  -- label aside for a second because --

3          MR. NEIER:  Yeah.

4          THE COURT:  -- it's -- in a way it's a bit

5     distracting.  But just evaluating it without any labels does

6     it make sense to do this or not in terms of understanding the

7     conduct where you just say, well, it's all part of one

8     transaction and these different actors are all acting in --

9     together to accomplish this transaction.  Nothing particularly

10    unusual about that.  That happens all the time.

11         MR. NEIER:  Yes.

12         THE COURT:  But for purposes of assessing --

13    assessing contacts because it is one series of transactions

14    accomplished with a number of different entities, one

15    individual and two companies -- whichever two companies,

16    you're choosing KREH and somebody else --

17         MR. NEIER:  Right.  I think we're --

18         THE COURT:  -- does it make sense to evaluate them

19    together.

20         MR. NEIER:  I think I would say, Your Honor, that

21    even if you were to do so you would still come to the same

22    answer.  That is, if you aggregated all of the contacts

23    involving KH, KREH, and Mr. Kulczyck, I don't know if you

24    could really allocate -- I don't think you could aggregate

25    Kulczyck Investments or MyPlace into those.  But if you

20

1   aggregate just KREH, KH and Mr. Kulczyck, you still don't have

2   enough because you're still talking about an investment in

3   Polish real estate that's then assigned to a Polish entity and

4   in an agreement governed by Polish law.

5          So even if you were to aggregate those three, that

6   is Mr. Kulczyck, Kulczyck Holdings and KREH, you still do not

7   have enough.  The only allegation against KH is that they sent

8   the wire.  That's the only allegation against them.

9          But if you were to aggregate that with KREH, all

10  KREH was -- is the counter-party to the agreements which are

11  governed by Polish law, they're a Polish company, they're

12  buying an investment -- a debt and equity investment in

13  Poland.

14         And then if you add Mr. Kulczyck and this email

15  exchange that is alleged to have occurred between

16  Mr. Sledziejowski and Mr. Kulczyck, even go -- parsing through

17  those emails you don't get to minimum contacts because

18  Mr. Kulczyck says in his email they are willing to offer X and

19  Mr. Sledziejowski replies or, you know, says in another email,

20  "I know you're worried about buying this investment at a

21  discount."  And personally I don't think that a defendant who

22  is concerned about the insolvency of its counter-party, that's

23  a good thing, not a bad thing and that doesn't raise some kind

24  of specter that they're engaged in a fraudulent activity.

25  Quite the contrary.

21

1            THE COURT:  Well, I guess from my purposes, I don't

2   even have to get into it.

3            MR. NEIER:  Yes, you don't.

4            THE COURT:  So I just look at the emails and say --

5            MR. NEIER:  Right.

6            THE COURT:  -- where's the contact happening, what

7   does it mean.  And I understand your view to be that the

8   emails, at least as described, don't establish any conduct in

9   the -- with the contact with the forums.

10            MR. NEIER:  There's no way to tell where an email is

11   accessed or at least on the facts alleged in the complaint

12   there's no way to tell where an email is accessed, where it's

13   sent from or to, where each party was located or even, for

14   that matter, anything else about the -- involving the emails.

15   In this day and age we don't even know where the servers are

16   located.  So --

17            THE COURT:  So what are you --

18            MR. NEIER:  -- even if you were to aggregate those

19   three.

20            THE COURT:  Let me ask.  So it could be that there's

21   additional information about the emails that might tell you

22   something.  For example, if there's an email address, that

23   email address is to accompany the United States, that would be

24   a contact.  You might say it's an insufficient contact, but

25   you might learn something by an email address, you might not;

22

1   depends on what it is.

2          MR. NEIER:  You might not; you might.

3          THE COURT:  All right.  Fair enough.  All right.  I

4   think that was my big question about personal jurisdiction.

5          MR. NEIER:  Right.  As I said, Your Honor, I think

6   the Court is familiar with the test.  We think that we don't

7   have a disagree with the Trustee on the test.  We think it's

8   outlined in the <u>Lehman</u> and <u>Arcapita</u> cases.  In particular,

9   obviously they're based on the <u>Walden</u> case by the U.S. Supreme

10  Court and --

11         THE COURT:  Let me ask.  I was having a debate with

12  people in chambers about whether <u>Walden</u> actually signals any

13  change in the law.  I frankly don't read it that way.  I read

14  it to be sort of an unusual set of facts which I may comment

15  on things and basically say, under this -- these set of

16  circumstances the only thing you have is the fact that the

17  particular party resides in a foreign state because all the

18  other conduct was somewhere else.

19         MR. NEIER:  There's no question that as a Bivens

20  action the <u>Walden</u> case is completely different on the facts

21  and, yet, it's -- and it's not a change in the law.  It's just

22  a U.S. Supreme Court that's most recent that everybody goes

23  to --

24         THE COURT:  Right.  All right.

25         MR. NEIER:  -- to state what the law is.

23

1          THE COURT:  I think that's fair enough.  I actually

2   have another case where someone is wanting to see change and I

3   frankly just don't see it, but --

4          MR. NEIER:  Well, I would say to see change in this

5   in that you could argue that the way New York law, not federal

6   law but New York law, says there should be personal

7   jurisdiction might be affected by the standard outlined in

8   Walden, but that's not before Your Honor.

9          THE COURT:  Right.

10          MR. NEIER:  That's not really --

11          THE COURT:  Right.  Yeah, how you'd understand the

12   long-arm statute in terms of --

13          MR. NEIER:  Correct.

14          THE COURT:  -- doing business and I can see that.

15   All right.  So let's move on I guess to whatever else we need

16   to address and certainly maybe we could start with safe

17   harbor.

18          MR. NEIER:  So the safe harbor, every bankruptcy

19   judge's favorite having to deal with.  So what we said in our

20   motion to dismiss is this is a settlement payment.  Clearly

21   it's a settlement payment for securities and settlement

22   payment is broadly interpreted.  And it's by or to or for the

23   benefit of a financial participant, which is also broadly

24   determined here.  And Kulczyck Holdings, as a real estate

25   development company, Kulczyck Investments as an investment

24

1  company, and all of this is alleged in the complaint, and I

2  could go through the specific allegations but that's what the

3  allegations are, that would be, you know, a payment, too.  And

4  then, of course, we don't have any allegations as to what

5  Innovest or TWSIP are in the complaint, although they do cite

6  a [indiscernible] proceeding involving Mr. Sledziejowski,

7  Innovest, TWSIP.  It's fair they were probably in the

8  investment game as well.

9       And so we think that under the first standard, that

10 is, a settlement payment by or to or for the benefit of a

11 financial participant, which is an incredibly broad standard,

12 you're probably there.  But even if you were to say there's

13 some, you know, quibble about what is a financial participant,

14 clearly, you know, there may be an allegation that some of the

15 other terms, stockbroker or commodities broker, et cetera, et

16 cetera, apply, financial institution.  But clearly, if you

17 were to just take out that standard and you went to the second

18 standard for 546(e), which is a transaction involving

19 securities or in connection with a sale of securities by or to

20 the benefit of a financial institution, you're there because

21 the complaint alleges that the wire transfers made to Bank of

22 America.  Bank of America is a financial institution as

23 defined in the Bankruptcy Code because it's an FDIC insured

24 institution.

25       And so you have a securities transaction buyer to or

25

1  for the benefit of a financial institution and the way the

2  courts have interpreted that is even if the financial

3  institution is a mere conduit, even if it's just a wire

4  transfer, it's still governed -- it's still governed by

5  546(e).  A lot of people don't like that.  A lot of people

6  think that Congress missed it, but that's a complaint to

7  Congress.

8          Now, the Trustee comes back on -- in opposition to

9  the motion to dismiss and says, well, we're not suing on the

10 actual wire transfer.  We're only suing with respect to the

11 transfer of the loan agreements, but we're not suing on the

12 consideration that was made for the loan agreements.  Now, we

13 think that completely guts their complaint.  We think it

14 completely guts --

15         THE COURT:  Say that again.  And this is, I think,

16 important because I had it listed just because it --

17         MR. NEIER:  Yeah.

18         THE COURT:  -- I wanted to make sure I got it right.

19 So they're not suing on the wire transfer, which is when one

20 of the Kulczyck entities wire transfers seven million dollars

21 to Innovest in the U.S.  Is that what you mean by that?

22         MR. NEIER:  Well, what the Trustee says is that they

23 were only suing with respect to the transfer of the debt and

24 equity investments in MyPlace and this is in -- this is in the

25 opposition brief obviously, but they're not suing with respect

26

1  to the transfer of the funds itself and, therefore, 546(e)

2  does not apply.

3         First of all, we don't think you can do that because

4  the complaint clearly says -- and I'll quote from paragraph

5  112 of the complaint -- the amount of the KEH transfer

6  constitutes less than fair consideration for the total amount

7  owed under the tranche loans.  You know, I don't know how you

8  could allege that without talking about the wire transfer.

9  And frankly, I don't know how you can sue just with respect to

10 the transfer of the debt and equity investments in the MyPlace

11 entities without talking about what was paid for it.  That's

12 sort of like, you know, somebody buys a bagel for 25 cents and

13 you say, well, I'm just suing for the bagel and the 25 cents

14 you paid is irrelevant.

15        So we think that you can't avoid 540 -- it's novel

16 and I haven't seen a case like it, but I don't think you could

17 avoid 546(e) by simply saying, oh, that's not going to be part

18 of our complaint.  And even beyond that, what that does to the

19 jurisdiction elements since you've just eliminated the wire

20 transfer into the United States by these entities and what it

21 does to the other allegations in the complaint would

22 completely undermine the complaint.

23        THE COURT:  All right.

24        MR. NEIER:  Once you get into the standard of 546(e)

25 then it becomes a really tricky exercise I think these days to

27

1   figure out what's covered by 546(e).  So clearly within the

2   real house of 546(e) are all constructed fraudulent claims --

3   all constructive fraud claims.

4           Then you go to the outer bands of 546(e), which some

5   people have challenged.  I think the easier one is claims that

6   are end runs around 546(e) in the safe harbor in 546(e) such

7   as unjust enrichment, turnover, monies had, received, et

8   cetera, the other alle -- the other counts in the complaint.

9           We think the law is pretty clear that those end runs

10  cannot be permitted, but that issue may be cognitive on by the

11  Second Circuit in the Tribune and Sencrew [ph.] case.  It's

12  not really before the Second Circuit and cases like Heckinger

13  and other cases, [indiscernible], would say that that's

14  clearly an impermissible end run around 546(e).

15          The outer band, if you will, is whether or not

16  intentional state law broad claims can be subject to the safe

17  harbor in 546(e).  Obviously you have Judge Glenn, Judge

18  Gerber, Judge Sullivan in the District Court disagreeing in

19  whole or in part.  We have Judge Rakoff and some other judges

20  who have said, no, Congress means what it says and the

21  statute, 546(e) reads, "Notwithstanding Sections 544" and

22  since those are the first three or four words in the 546(e),

23  you can't sue at all under 544, which means you can't sue even

24  for intentional state law fraud claims.

25          I would note the Tribune was argued November of

28

1  2014, so it's been over a year.  It was November 3, 2014.

2  There hasn't been a decision.  Oral argument was very much in

3  favor of the defendants, but there hasn't been a decision.  So

4  clearly, something is up.

5        Since then, Judge Glenn in the Hallis case and I

6  believe Judge Gerber just reaffirmed his decision in Lydell

7  [ph.] in state law intentional fraud claims.  Actually, he

8  said that even constructive fraud law claims should not be --

9  under state law should not be subject to 546(e) because

10 they've been around since time immemorial.

11       So there is this dispute that's going on and it has

12 been argued in front of the Second Circuit.  We're all

13 awaiting the decision in Tribune [indiscernible].

14       THE COURT:  All right.

15       MR. NEIER:  With respect to turnover, we -- we're

16 not sure if you need to reach this, but if you do, we don't

17 think turnover can -- you know, turnovers for undisputed

18 property that's held by a counter-party, not for something

19 like this where you're alleging six years later that there was

20 less than fair consideration paid.

21       With respect to unjust enrichment -- and, by the

22 way, turnover, unjust enrichment, the state law claims, they

23 all -- they all presume that New York law applies.  And our

24 contention is that it will be the law of Poland that would

25 apply.  So even if this court were to find that there was

29

1  personal jurisdiction, we think the Court should be applying

2  the laws of Poland and not the laws of New York with respect

3  to these claims.

4       I think the Trustee has said that their turnover

5  claim based on -- or their accounting claim is only based on

6  Section 542 of the Bankruptcy Code.  As such, it would rise

7  and fall with their turnover claim so it'd have to be, once

8  again, an undisputed claim.

9       With respect to unjust enrichment, there's clearly

10 contracts here.  You can't have an unjust enrichment claim

11 when you have a contract.  Trustee says it's an alternative

12 remedy, but we think once there's an adequate remedy of law

13 which is what actually the Trustee is suing for, you can't

14 have an unjust enrichment claim.

15      Injunctive relief, I think the Trustee admits that

16 at this stage -- at this juncture they have no basis to assert

17 an injunctive relief claim.  They're simply putting it out

18 there as a placeholder and they're not seeking a preliminary

19 injunction.  They're only seeking a permanent injunction.  We

20 don't even think they can allege a permanent injunction

21 without actually alleging what's required.

22      For intentional state law, I think I've covered

23 this, but we don't think it's -- we don't think that the

24 complaint sufficiently alleges intentional state law claims

25 putting aside 546(e) and whether it covers state law claims.

30

1   Under Rule 9B you have to state who, what, when, where, how

2   and why.  For each defendant, particularized allegations, we

3   don't think the complaint does that.

4          And then we come to TWSIP.  Delaware law says that

5   once the Secretary of State of Delaware has issued a

6   certificate of dissolution, that entity can no longer be sued.

7          Now, there's a metaphysical problem with me arguing

8   this:  number one, I don't represent TWSIP; and number two,

9   who could represent TWSIP?  I doesn't exist.  So in other

10  cases involving Delaware, whether or not an entity could or

11  could not be sued under Delaware law, the Delaware courts have

12  accepted other people standing up and saying, Your Honor, this

13  entity has been dissolved, a certificate of dissolution has

14  been issued and, therefore, the entity cannot be sued.

15         So I'd ask Your Honor to take it the way Delaware

16  courts do and Judge Chapman did in the <u>Boston Generating</u> case,

17  which is they just do.  They just allow it.  But technically

18  or actually, I don't represent TWSIP and I don't think anybody

19  could, so they are defenseless.  And I think that's what

20  Delaware had in mind.  Once they issue a certificate of

21  cancellation no one can represent TWSIP and that's why they

22  cannot be sued and, of course, if TWSIP cannot be sued the

23  complaint falls.

24         THE COURT:  All right.

25         MR. NEIER:  Thank you, Your Honor.

31

1          THE COURT:  Thank you.  All right.  Let me hear from

2     the Trustee.

3          MR. RIGANO:  Thank you, Your Honor.  Your Honor, I'd

4     like to take a step back for a moment and discuss the

5     relationship between Mr. Sledziejowski and Mr. Kulczyck

6     because it's a little bit more important that what defendant

7     has revealed here today.

8          As a part of the complaint Mr. Kulczyck went to high

9     school with Mr. Sledziejowski's ex-wife.  Mr. Kulczyck and

10    Mr. Sledziejowski developed a long-time relationship.  In 2006

11    Mr. Kulczyck came up with this great idea, to re-zone farmland

12    in Poland to develop multi-unit apartment complexes.  Kulczyck

13    did not have the capital to develop this project, so -- and he

14    did not want to go to his father, who was at the time the

15    richest man in Poland.  He wanted to prove himself.

16         So he approached Mr. Sledziejowski on the United

17    States soil, Mr. Sledziejowski, a United States citizen, for

18    capital.  Sledziejowski through TWS Investment Partners, a

19    United States entity, advanced over 12 million dollars to

20    MyPlace development on Kulczyck's behalf.

21         The 12 million dollars was advanced in four separate

22    tranches and presumably MyPlace used the 12 million dollars to

23    develop -- to re-zone and develop this property.  In exchange

24    for the 12 million dollars TWS Investment Partners received

25    the debt interest whereby MyPlace was to repay the 12 million

32

1   dollars plus interest.  In addition, Mr. Sledziejowski

2   personally received a 25 percent equity interest in TWS

3   Investment Partners.

4         Between the time when the loans were made and when

5   the assignment agreements were executed, Mr. Kulczyck came to

6   the United States to discuss these transactions.  On

7   December 2nd, 2009, if we flash forward, Mr. Kulczyck and

8   Mr. Sledziejowski engaged in some email correspondence.  And I

9   want to quote the email correspondence for Your Honor.

10        In paragraph 109 of the complaint, Mr. Sledziejowski

11  states to Mr. Kulczyck:

12        "You, of course, are aware that I do not have a

13     negotiating position, but at the same time I can assure

14     you that there shall be no risk related to the potential

15     claims, et cetera, of which KI is afraid because of the

16     discount."

17  Presumably, when stating "KI," Mr. Sledziejowski was referring

18  to Kulczyck Investments.

19        In response to that email, Mr. Kulczyck states:

20        "They offer 45 percent.  I know it is a lot, but I

21     promise you, as we spoke, that I will compensate your

22     losses as soon as we get out of the investment."

23        By this exchange -- this exchange is critical for a

24  couple of reasons.  By this exchange Mr. Kulczyck was aware

25  that Mr. Sledziejowski (a) had no bargaining position and was,

33

1  therefore, not negotiating at arm's length; and in addition,

2  that Mr. Kulczyck expressly made the representation to

3  Mr. Sledziejowski that he would "compensate" his losses.

4  Mr. Sledziejowski relied on his representation of his good

5  friend at the time.

6  The next day, December 3, 2009, Mr. Kulczyck

7  executed assignment agreements on behalf of MyPlace with

8  Mr. Sledziejowski on behalf of TWS Investment Partners.  By

9  those agreements TWS Investment Partners, a United States

10  entity, transferred 14 -- the 14 million-dollar balance to the

11  accrual of interest in debt owed to Kulczyck Real Estate

12  Holdings in exchange for a seven million-dollar --

13  THE COURT:  Yeah, I understand that.  Let me ask you

14  going back to this.  What I understand the Trustee's complaint

15  to be is that when Mr. Sledziejowski, Innovest, TWSIP were

16  essentially taken out of the investment by virtue of these

17  assignments and these other agreements and the payments, that

18  it wasn't a fair deal.  And so we can get into exactly the

19  claims and how it's all -- but that's -- so that all happens

20  in 2009.

21  So let me just take each of the defendants

22  separately.  What's the basis for jurisdiction as to MyPlace?

23  MyPlace is not part of that transaction because it's a

24  transaction between -- between Mr. Sledziejowski, his entities

25  TWSIP, Innovest on one hand, Mister -- and Mr. Kulczyck's

34

1    entities, Kulczyck Real Estate Holdings and, to some degree

2    that is unclear, KI and -- and the -- the two other ones and I

3    keep losing track on my cheat sheet here as to what they are.

4    But I think it's --

5              MR. NEIER:  KREH.

6              THE COURT:  -- KREH and KH.  So I'm wondering where

7    MyPlace fits into this at all because essentially

8    they're what's being swapped.

9              MR. RIGANO:  Sure, Your Honor.

10             THE COURT:  So why -- I'm not sure why they're a

11   defendant and I'm certainly not sure why they are -- whey

12   there's jurisdiction against them based on a transactional

13   test that we all agree should be employed here.

14             MR. RIGANO:  Well, so, Your Honor, as the defendants

15   mentioned, while the Trustee doesn't concede general

16   jurisdiction for purposes of this argument, specific

17   jurisdiction requires the rela -- the Court to review the

18   relationship between the forum of the defendants and the

19   litigation.  You were talking about MyPlace in the United

20   States as the forum of the defendant and the litigation

21   itself.

22             The litigation here by the complaint, the Trustee

23   seeks the avoidance and recovery of three separate transfers.

24   There's an addition -- the turnover of unjust enrichment, et

25   cetera.

35

1          The three transfers at issue include the receivable

2     transfer, which we've just discussed, the purported equity

3     transfer by Mr. Sledziejowski of his equity interest in

4     MyPlace Development, as well as the Innovest transfer.  And as

5     we discussed earlier, Your Honor, the Innovest transfer is the

6     transfer of 1.3 million dollars made directly to MyPlace

7     Development.  MyPlace Development entered into a contract with

8     TWS Investment Partners for the acquisition of debt 12 million

9     dollars; 1.3 of that -- of the million dollars was transferred

10    by Innovest, the United States debtor, to MyPlace Development

11    and received nothing in return.

12          THE COURT:  So help me put this -- the papers don't

13    focus on this, so help me put this in context.  When is this

14    Innovest transfer of 1.3 million dollars to MyPlace?

15          MR. RIGANO:  It occurred in one of the tranches.  I

16    believe it was in 2007.

17          THE COURT:  So it's before the -- essentially the

18    buyout?

19          MR. RIGANO:  Yeah, correct, Your Honor.

20          THE COURT:  All right.  So Innovest then essentially

21    gives more money to MyPlace, right, because they've already

22    given the 12 million dollars --

23          MR. RIGANO:  Part of the 12 million is part of the

24    1.3.

25          THE COURT:  Okay.  So part of the -- and help me

36

1   understand what that is because is it a loan that's just not

2   repaid?  What exactly is it that you're challenging?

3            MR. RIGANO:  The 1.3 million dollars was presumably

4   made by Innovest on behalf of TWS Investment Partners pursuant

5   to one of the loan agreements that was entered into by and

6   between --

7            THE COURT:  Right.

8            MR. RIGANO:  -- MyPlace Development and TWS

9   Investment Partners.  So MyPlace Development contracted with

10  TWS Investment Partners, a United States entity, accepted 1.3

11  million dollars from that United States entity, did not repay

12  that 1.3 million dollars and we stand before Your Honor today.

13           THE COURT:  But isn't that part of the -- is that

14  part of the buyout, in other words, when TWSIP assigns its

15  rights under the loan, is this one of the loans?

16           MR. RIGANO:  Right, Your Honor.  This is an

17  alternatively pled cause of action.  So if Your Honor finds --

18           THE COURT:  But I guess I'm not -- I guess I'm not

19  understanding how it's supposed to work.  So if it's one of

20  the loans, I thought the Trustee's complaint was that

21  essentially you didn't give us a fair shake.  When we -- you

22  owed us in excess of 12 million dollars.  We didn't get that

23  back.  We got a lot less back and this is just not kosher at

24  all.

25           So -- but that -- that seems to be the way the value

37

1   for the assignment, right?  So who knows what -- I mean, for

2   purposes MyPlace is separate from Kulczyck Real Estate

3   Holdings, so I'm just -- I'm having trouble understanding what

4   that's supposed to be because, after all, it sounds like that

5   loan obligation still outstanding was just transferred.

6           MR. RIGANO:  Well --

7           THE COURT:  So how can you say it wasn't a fair

8   payment because, after all, it wasn't one of the ones that was

9   transferred.

10          MR. RIGANO:  Because, Your Honor, the first cause of

11  action we contend is an alter ego cause of action.  The

12  assignment agreements were by and between TWS Investment

13  Partners and My -- and Kulczyck Real Estate Holdings.  The

14  Trustee does seek to collapse an alter ego in alter ego

15  fashion Innovest Holdings and TWS Investment Partners.  In the

16  event --

17          THE COURT:  See, now I'm confused.  I don't have

18  anything about alter ego in the papers I have, so -- and, in

19  fact, I have in -- I don't remember if it's the opening brief

20  or the reply saying, in fact, there is no alter ego claim.  So

21  I'm -- what is it that I have in front of me and what is it

22  that I don't have in front of me?

23          MR. RIGANO:  Your Honor, the alter ego claim was

24  against TWS Investment Partners.  That's the first claim for

25  relief set forth in the complaint.  The reason why it's not

38

1  before you is because the defendants do not represent TWS

2  Investment Partners.  The defendants have claimed that we

3  can't sue TWS Investment Partners for those purposes.  That's

4  a separate issue and that's where this comes in.

5          So if we could just take a step back, the assignment

6  agreements themselves are between TWS Investment Partners and

7  Kulczyck Real Estate Holdings SAR; they're not between

8  Innovest and Kulczyck Real Estate Holdings SAR.

9          So the point is, with the Innovest transfer in the

10  event that Your Honor finds that in the un --

11          THE COURT:  Well, here's the thing that I'm confused

12  about.  I'm looking at the opposition -- okay, never mind.  Go

13  ahead.  I've got it.  So explain to me again how this fits --

14  how this works.

15          MR. RIGANO:  Sure.  So, again, the assignment

16  agreements are -- I can back up further  The loan agreements

17  are between TWS Investment Partners and MyPlace Development.

18          THE COURT:  Right.

19          MR. RIGANO:  The assignment agreements are there

20  after -- between TWS Investment Partners and Kulczyck Real

21  Estate Holdings.

22          THE COURT:  Right.

23          MR. RIGANO:  TWS Investment Partners is not a debt.

24  TWS Investment Partners is wholly owned by Innovest, 100

25  percent shareholders.

39

1          THE COURT:  Right.

2          MR. RIGANO:  The Trustee has made allegations in the

3   complaint seeking a declaration that TWS Investment Partners

4   and Innovest are alter egos.

5          THE COURT:  Right.

6          MR. RIGANO:  In the event that Your Honor does not

7   decide in the affirmative for the Trustee to that claim, we

8   have a transfer made by Innovest for which Innovest was not a

9   party to a contract, for which Innovest would have provided

10  and received no consideration, and therefore, are asserting

11  that that transfer is an avoidable and recoverable fraudulent

12  transfer as against MyPlace because MyPlace actually received

13  that 1.3 million dollars pursuant to one of the loan

14  agreements.

15         And so, therefore, because MyPlace contracted with

16  the United States entity except that a payment from the United

17  States entity negotiated with the United States entity --

18         THE COURT:  Is there any dispute -- does anybody

19  contest that Innovest and TWSP are -- essentially should be

20  treated as alter egos?  The reason why I ask is this is --

21  this alternative theory, frankly, doesn't make any sense to

22  me.  It seems to be that this loan that you're talking about

23  is one of the tranches of the loans and the loans that are

24  assigned and this whole case is about whether the assignment

25  is for fair value or not and that's what the case is going to

40

1   the merits of it.

2          So I'm just -- I -- it was a helpful explanation so

3   now I understand.  You're saying if somehow somebody contests,

4   you know, this alter ego that you're treating each one of them

5   separately and so there's this separate transaction and that

6   seems to be avoidable.

7          But I guess my problem is then I don't really

8   understand how to read the rest of the complaint because it

9   purports to say that the assignment of all three loan -- the

10  three loans were then assigned.  So I'm just having trouble

11  understanding as a practical matter how those things -- I

12  guess that's what alternative pleadings are and they are often

13  mystifying to anybody who thinks is -- as a practical matter

14  but I just don't understand how you can really square the two.

15  But I -- and you're --

16          MR. RIGANO:  Your Honor --

17          THE COURT:  -- your explanation is helpful.

18          MR. RIGANO:  -- this is an alternative pleading,

19  Your Honor.  In addition, with respect to MyPlace --

20          THE COURT:  But I don't know who would contest it.

21  Certainly I think on the other side they don't care one way or

22  the other, so --

23          MR. RIGANO:  Well, they have contested it, but --

24  not substantively, but procedurally based on the Delaware Code

25  and that they are claiming that TWS Investment Partners cannot

41

 1   be sued for alter ego purposes, we disagree with that.

 2            I'm sorry?

 3            MR. NEIER:  Superior.

 4            MR. RIGANO:  I'm sorry?

 5            MR. NEIER:  Oh, superior.  Right.

 6            THE COURT:  I see what you're saying.  All right.

 7   So it all collapses down to that issue.  Okay.

 8            MR. RIGANO:  Right.

 9            THE COURT:  All right.  That's helpful.

10            MR. RIGANO:  Your Honor, as with respect to MyPlace,

11   MyPlace is just -- they're all over these documents.  They

12   negotiated these documents with Mr. Sledziejowski.

13   Mr. Sledziejowski is a United States citizen.  TWS Investment

14   Partners is a United States entity.  MyPlace received 12

15   million dollars from the United States entity.  MyPlace

16   presumably used the 12 million dollars.

17            THE COURT:  But certainly -- again, I don't want to

18   over-read Walden, but Walden has a weird set of facts that

19   talks about, you know, things happening outside the form of

20   bravada where this person sued and was a resident and said --

21   you know, at a certain point, we don't care if all you've got

22   is the residence of the party; it's not enough.

23            Now here I understand you're saying no, there's

24   context because people are reaching out to the forum.  They

25   understand, but -- so let's take the things that then are

42

1   alleged.  This is probably as good a segue as any.

2        So you've got -- you have an agreement.  There

3   doesn't seem to be any dispute that the original agreement is

4   in Polish, governed by Poland law and it's for farmland in

5   Poland.  So where -- what's been highlighted is the wire

6   transfer, the emails, and essentially other communications.

7        So why don't you walk through and I think we need to

8   do this defend -- well, do you agree that that has be done

9   defendant by defendant?

10       MR. RIGANO:  Yes, Your Honor.

11       THE COURT:  All right.  So let's walk through each

12  of the defendants and what you think stacks up for that

13  defendant, so I guess MyPlace is as good a place to start as

14  any.

15       MR. RIGANO:  And, Your Honor, we can go defendant by

16  defendant, but if we reserve, again, to discuss the mere

17  department doctrine --

18       THE COURT:  Yeah.  No, absolutely.

19       MR. RIGANO:  -- because I do believe that the

20  defendants are all intertwined here.  And to such an extent

21  that they -- you know, their relationship is not being ignored

22  for purposes of the jurisdiction.

23       THE COURT:  Well, but the problem I have with the

24  mere department doctrine is it's in your brief, it's stated

25  and then you move on to something else.  So the way I see

43

1   courts dealing with jurisdictional discovery because there's a

2   lot of discretion is it almost seems like a Rule 56 situation

3   where someone says, "I can't respond to your summary judgment

4   because here's what I don't know and here's what could be out

5   here and here's what I need jurisdiction.  Not general

6   jurisdiction; specific items that I need to find out here's

7   the one I want to depose.  Here's the kind of things I want to

8   find out."

9          And the mere department doctrine is just to sort of

10  put out there and set adrift, but there's no narrative as to

11  how it applies here.  I mean, I certainly spent some time

12  thinking about what you might mean by that, but I -- but we'll

13  get to it.  So let's go defendant by defendant, then we'll

14  talk about --

15          MR. RIGANO:  Sure.

16          THE COURT:  -- the issues of aggregation and mere

17  department.

18          MR. RIGANO:  Okay.  So we discussed MyPlace.  Just

19  to finish up on MyPlace, Your Honor, MyPlace, again, is

20  just -- they're all over the documents.  They accepted 12

21  million dollars of United States money in United States

22  dollars from a United States entity which ended up ultimately

23  becoming essentially a United States debtor with unsecured

24  creditors.

25          THE COURT:  But what case law are you relying for

44

1  the fact that that's enough?  I mean, there's a deal -- your

2  adversary says, hey, they reached out to Poland.  It's not the

3  Polish people reaching out to the U.S.  It's Polish real

4  estate, it's a Polish contract under Polish law, it's for

5  Polish farmland.  What is it as a matter of law and case law

6  that you can rely upon the fact that, hey, this is a U.S.

7  counter-party and that's enough?

8           MR. RIGANO:  Your Honor, in -- I believe it's <u>Agoin</u>

9  [ph.].  It's a Madoff case that we cite in our brief.  In that

10 case the customers of Madoff signed a cust -- the customer

11 agreement in France, negotiated a customer agreement in

12 France.  The agreement was written in French.  The only

13 different -- the only way to assert jurisdiction over this

14 defendant was for the -- if you look at the transfers made to

15 and from the defendant's account in New York, Madoff's -- that

16 Madoff would preside over, and the court held that the

17 jurisdiction there was enough that the context were enough to

18 establish jurisdiction over the defendants.

19           Even though everything happened in France,

20 everything was in France, the signing of the agreements,

21 people never entered -- the defendants never entered into

22 America, the transfers enough -- were enough, that the

23 transfers alone were enough.

24           THE COURT:  But weren't there additional factors in

25 that case?  In other words, they're doing business with

45

1   somebody who's -- who's in the United States in the sense

2   of --

3          MR. RIGANO:  That's --

4          THE COURT:  -- you're not buying Polish farmland.

5   You're saying, I'm giving -- I'm handing up my money over to a

6   U.S. entity to invest in the United States consistent with how

7   you see -- how you see fit.

8          So it's not merely money -- it's money entering the

9   jurisdiction to stay in the jurisdiction to be dealt with by

10  somebody in the jurisdiction.  So, I mean, that seems to be

11  different.

12         MR. RIGANO:  And in a similar way, though, Your

13  Honor, MyPlace has reached into the United States by taking 12

14  million dollars to funds its operations.  It's similar to an

15  investor reaching to the United States.

16         THE COURT:  Then you're saying anytime anybody

17  enters into a contract with anybody in the U.S. it is --

18  there's personal jurisdiction.  I don't know of any cases that

19  read it that broadly.

20         MR. RIGANO:  There has to be -- right, there has to

21  be a business relationship -- continuing business relationship

22  with that entity.  That's what Burger King says, the United

23  States Supreme Court.  And here, based on the fact that you

24  have four loan tranches, interest continues to accrue, MyPlace

25  is obligated to repay those loans.  We do believe that there's

46

1   a continuing business relationship [indiscernible].

2           THE COURT:  All right.  All right.  Does it matter

3   that there's two MyPlace entities?  I don't know if there's

4   any daylight between -- what we've been talking about MyPlace

5   in the aggregate, but I understand there's MyPlace Z.O.O.,

6   MyPlace SKA, and we've been referring to them as MyPlace, but

7   obviously they're separate entities.  Does it matter for the

8   analysis here?  I haven't heard anybody put any daylight

9   between the two of them.

10          MR. RIGANO:  Right.  Your Honor, we do not believe

11  it matters.  We believe they're the same entity.  It appears

12  that MyPlace is operated -- you know, they're a multi-unit

13  apartment complex under these names.  There's been no

14  distinction with respect to the loan agreements and the

15  assignment agreements with respect to these entities.  So,

16  again, defendant doesn't assert that the entities are

17  different.

18          THE COURT:  All right.

19          MR. RIGANO:  In addition, Your Honor, one last thing

20  with respect to MyPlace.  The Trustee does plead a turnover

21  cause of action here.  And the Trustee's turnover cause of

22  action relates to the fact that the Trustee believes that the

23  equity transfer -- the transfer of Mr. Sledziejowski's 25

24  percent equity interest to MyPlace was not ever consummated.

25  And the Trustee's basis for these allegations are as follows.

47

1          The defendants attach to their motion the Elkin

2    declaration.  Attached to the Elkin declaration is Exhibits G

3    and H by the share, sale, transfer agreement, which is the

4    purported agreement whereby Mr. Sledziejowski was to transfer

5    his equity interests to Kulczyck Real Estate Holdings.

6          A review of the signature pages of that transfer

7    agreement reveals that Kulczyck Holdings did not sign the

8    transfer agreement.  There's no fully executed transfer

9    agreement.  The payment was never made.  The trustee is left

10   with an agreement simply signed by Mr. Sledziejowski.  An

11   analogous situation would be in a real estate --

12          THE COURT:  Well, I'm not going to get to the

13   merits, so what does it mean for jurisdiction?

14          MR. RIGANO:  Well, for jurisdiction purposes

15   essentially Roman Sledziejowski, we believe, still owns 25

16   percent equity -- has a 25 percent equity interest in MyPlace.

17   And, therefore, that equity interest should be turned over to

18   the Trustee, that it's property of the estate.  And certainly

19   Your Honor has worldwide jurisdiction over property of the

20   estate.

21          THE COURT:  All right.  Anything else on MyPlace?

22          MR. RIGANO:  I believe that's all for MyPlace, Your

23   Honor.

24          THE COURT:  All right.

25          MR. RIGANO:  If we want to move on to Kulczyck Real

1   Estate Holdings SAR, this entity is the entity that purchased

2   and acquired the debt from TWS Investment Partners.  And

3   again, Your Honor, in discussing specific jurisdiction, we

4   have to look at the relationship between a forum in the United

5   States, the defendant here Kulczyck SAR and the litigation.

6   And if we step back --

7            THE COURT:  Wait.  Let me step back for a second.

8            MR. RIGANO:  Sure.

9            THE COURT:  Which entity are you talking about?

10           MR. RIGANO:  Kulczyck SAR.  That's the purchaser.

11  Kulczyck Real Estate Holdings, SAR.

12           THE COURT:  All right.  Look -- so let's -- so it's

13  also been referred to as KREH?

14           MR. RIGANO:  KREH.

15           THE COURT:  All right.  Let -- yeah.  I'm just

16  trying to use the same labels for the same --

17           MR. RIGANO:  It gets confusing, Your Honor.

18           THE COURT:  -- companies.  It just -- I thought that

19  was the same one you were referring to --

20           MR. RIGANO:  Yes, Your Honor.

21           THE COURT:  -- but just to save us all some sanity.

22  Thank you.  I appreciate it.

23           MR. RIGANO:  So again we have to look at the forum,

24  United States, the defendant here, KREH, and the litigation

25  itself.  The litigation -- by the litigation the Trustee seeks

49

1   the avoidance and recovery of the receivable transfer and in

2   the event that it was consummated the equity transfer.  The

3   receivable transfer was the transfer of 14 million dollars to

4   Kulczyck Real Estate Holdings SAR -- sorry, KREH, in

5   exchange -- and TWS Investment Partners received seven million

6   dollars in exchange.

7           So the critical inquiry is what were KREH's contacts

8   with respect to the fraudulent conveyance action?  Under

9   Second Circuit case law where a defendant -- where defendant's

10  contacts proximately caused the damages asserted, specific

11  jurisdiction and minimum contacts are established.

12          Here that is precisely the case here.  KREH entered

13  into the assignment agreements with TWS Investment Partners.

14  TWS Investment Partners is a United States entity.  KREH

15  negotiated with TWS Investment Partners.  He negotiated with

16  Mr. Sledziejowski knowing that Mr. Sledziejowski was a United

17  States citizen.  KREH accepted the transfer from TWS

18  Investment Partners, which again was debt held by a United

19  States entity, knew that Mr. Sledziejowski was operating

20  without "bargaining position," and through its agent

21  Mr. Kulczyck --

22          THE COURT:  But you're -- you're -- when you talk

23  about the new operating in that bargaining position, we're

24  blending into the merits.  I don't need to start getting into

25  what people knew.  I just need to get into what the contacts

50

1   are with the forum that relate to the suit.

2          So you say the assignment agreement is negotiated

3   with folks in the U.S., right?  That seems to be where you're

4   coming from.

5          MR. RIGANO:  The assignment agreement was negotiated

6   with TWS Investment Partners, a United States entity.  TWS

7   Investment Partners received a 14 million-dollar equity

8   exchange -- I'm sorry, debt exchange or assumed the assignment

9   of a debt, and in exchange they sent seven million dollars to

10  a New York-based bank account.

11         THE COURT:  Well, let me ask this.  They make the

12  argument that even putting aside minimum contacts with the

13  suit, then you have to think about whether it makes sense in

14  terms of the second prong, which is the substantial justice

15  and fair play and all those good things.

16         So are you saying that because one of the counter-

17  parties is a U.S. counter-party, even if it's dealing with an

18  interest in Polish real estate with Polish entities and an

19  agreement governed by Polish law that it makes sense to

20  exercise jurisdiction here?

21         MR. RIGANO:  Well, Your Honor, I believe if this was

22  a breach of contract action those factors will be relevant,

23  but it's not a breach of contract action.  The relevant

24  inquiry is -- and the relevant causes of action here was

25  whether the transfer amounts -- the transfer itself amounts to

51

1  a fraudulent transfer.  I mean, United States Bankruptcy Code

2  and New York state better part of the law.

3         It's the transfer itself that's at issue.  That's

4  the litigation.  When we're looking at the forum, the

5  defendant in the litigation, that's the litigation aspect.

6  The transfer itself.  The transfer itself happened with me by

7  United States entity and a consideration was received by the

8  United States entity.

9         And it's for that reason --

10        THE COURT:  But I think you and I just said the same

11  thing.  I mean, I -- you're saying that it's enough that one

12  of the parties is a U.S. party and it's on one end of the

13  transaction, so whatever consideration it's gotten, it's

14  gotten.  I know you're making a distinction between the

15  transfer and a contract action, but frankly I don't see it

16  because you need exchange of consideration in the contract

17  action anyway.  So I'm not sure -- I mean, do you have any

18  cases that says that that -- the fact that we're talking about

19  a fraudulent conveyance case makes it -- the analysis somehow

20  just kind of unique in terms of the transfers?

21        MR. RIGANO:  Well, again, I would say to you Agoin

22  and, as well, I would also cite the Deutsche Bank, which we

23  cite in our case -- in our opposition.  In Deutsche Bank

24  the -- an entity based in a foreign state is negotiating

25  acquisition of debt by email exchange.  And the court held

52

1    that that email exchange because they were reaching out and

2    seeking a purchase of debt by that email exchange, those

3    contacts were enough because the cause of action relating --

4    related to the purchase itself.  And so --

5            THE COURT:  Were those emails with a party in the

6    U.S.?

7            MR. RIGANO:  It was a state law cause of action and

8    so they were looking at -- it was in the United States and

9    they were looking at jurisdiction amongst the states.

10           THE COURT:  Right.

11           MR. RIGANO:  So similar analysis.  It's no

12   different.

13           THE COURT:  All right.  But I guess --

14           MR. RIGANO:  The question is --

15           THE COURT:  -- my point is, they rely on the emails

16   being from the estate in question where jurisdiction is being

17   asserted?

18           MR. RIGANO:  But again, so they -- an employee of

19   the purchaser was in a foreign state.  The employee of the

20   purchaser never entered or the purchaser never entered into

21   the state in which the seller is located.  The employee was

22   simply corresponding with the seller by email exchange and the

23   court held that that email exchange was enough.  There was

24   some other factors as well, Your Honor.  To be frank, there

25   was a couple other transactions that occurred --

53

1           THE COURT:  But I guess my question is --

2           MR. RIGANO:  -- [indiscernible] --

3           THE COURT:  -- I don't know what they felt was

4  relevant about the email exchange.  Is it details about where

5  the email was sent to or from?  I --

6           MR. RIGANO:  It was in negotiation of the purchase

7  of the debt.  That was --

8           THE COURT:  Not --

9           MR. RIGANO:  -- [indiscernible].

10          THE COURT:  That's okay.  I'll look it up.  I'm

11 trying to get a sense of what the email said about the

12 contacts.  I know it was for the purchase of the debt but if

13 the email was sent from, you know, Turgyestan [ph.] it

14 certainly wouldn't be relevant to contacts with the foreign

15 states.  So I'm trying to figure out what in case of -- I'll

16 look at it after we -- after we're done here.

17          So all right.  So we've -- anything else on KREH?

18          MR. RIGANO:  Your Honor, no.  Other than the fact

19 that, again, Mr. Sledziejowski relied on Kulczyck's

20 representations when reaching out to him with the email

21 exchange that he would compensate his losses.

22          THE COURT:  But what is the email exchange here?

23 It's in the complaint.  I don't have the email.  I don't know

24 where the email was sent to.  I don't know where the email was

25 sent from.

54

1          MR. RIGANO:  But it was certainly sent to

2     Mr. Sledziejowski on behalf of TWS Investment Partners.  TWS

3     Investment Partners --

4          THE COURT:  I don't know where it was sent.  I don't

5     have it.  So I know somehow it was communicated to him.

6     Mr. Sledziejowski seems to have had quite a few entities and

7     quite a few irons in the fire, so I don't know if he has

8     Polish counsel.  I don't know if he has -- I have no idea.  So

9     what is it you want me to take from the emails as pled in the

10    complaint?

11         MR. RIGANO:  The fact alone that the defendants knew

12    that they were negotiating with Mr. Sledziejowski who is a

13    United States citizen with respect to United States debt that

14    was extended by a United States entity.

15         THE COURT:  But my problem is that that seems to be

16    what you consistently are getting back to and I just -- I'm

17    not aware of cases where that seems to be enough.  Again, I --

18    my understanding is you sort of, look at -- you aggregate the

19    contexts and the contacts in the foreign estate and it -- for

20    however precise the cases talk about it, it's not quite that

21    precise.  And you look to see whether they are reasonable and

22    they pass both of the prongs.

23         But the test you're asking me to adopt seems to be

24    saying that if there's a U.S. counter-party and something

25    happens, some consideration is sent from or to that that's

1   enough.  Well, if there's a U.S. counter-party there's always

2   going to be something sent to or from, so then that just means

3   that jurisdiction should be based on the fact that there's a

4   U.S. counter-party and I'm not aware of any case law that is

5   that expansive.

6       MR. RIGANO:  Your Honor, I will say to that the

7   Trustee has also -- if Your Honor is having hesitation with

8   this, the Trustee has also requested the right to take

9   jurisdictional discovery.  And as Your Honor is aware, over

10  the past two months the landscape of this case has changed.

11  Your Honor has entered an order compelling Mr. Sledziejowski

12  to comply with his obligations to the Trustee.  In addition,

13  the Trustee has recently settled causes of action with

14  Mr. Sledziejowski.  Recently, in fact, Mr. Sledziejowski has

15  met with the Trustee's counsel face to face, had several

16  discussions regarding the causes of action at issue here, as

17  well as defendant's context.

18      So, Your Honor, we would request if Your Honor is

19  having hesitation with this with respect to where it said the

20  email was sent, the right to take jurisdictional discovery as

21  Mr. Sledziejowski may be able to provide clarity on those

22  issues.

23      THE COURT:  All right.  Well, let's get through the

24  rest of the defendants.  Anything else on KREH?

25      MR. MANISCALCO:  Your Honor, could I just add a

56

1  piece to that?

2          THE COURT:  Well, I'm hearing from one person --

3          MR. MANISCALCO:  Okay.  Sorry.

4          THE COURT:  -- and then you can converse at the end

5  and give me what you've got.

6          So anything else?  We've talked about KREH I think.

7  Anything else that we -- you wanted to discuss in connection

8  with that entity?

9          MR. RIGANO:  Sure.  I mean, Your Honor, we also do

10 understand and we do plead throughout the complaint that

11 Mr. Kulczyck presumably on behalf of KRH did -- and the other

12 defendants as well did appear in New York to discuss these

13 transactions with Mr. Sledziejowski.

14         THE COURT:  Where -- what part of the complaint are

15 we looking at for that?

16         MR. RIGANO:  Paragraph 37:

17         "Defendant Kulczyck visited Sledziejowski in the

18     United States on numerous occasions socially and for

19     business purposes."

20         THE COURT:  Yeah, but that's a general juris -- I

21 agree with the defendants.  As stated that's a general

22 jurisdiction kind of an allegation.  I -- you know --

23         MR. RIGANO:  Right.

24         THE COURT:  They've known each other forever and

25 that sort of cuts both ways.

57

1          MR. RIGANO:  But again, Your Honor, with respect,

2    the landscape of the case changing, as I just mentioned,

3    Mr. Sledziejowski certainly will provide, we believe anyway,

4    additional clarity with respect to Mr. Kulczyck's contacts

5    relating to that.

6          THE COURT:  All right.  All right.  Anything else as

7    to KREH?

8          MR. RIGANO:  That's it, Your Honor.

9          THE COURT:  Okay.  So let's move on to the next

10    entity.

11          MR. RIGANO:  If we take, let's say, Kulczyck

12    Holding.

13          THE COURT:  All right.

14          MR. RIGANO:  Kulczyck Holdings, the contact with

15    respect to Kulczyck Holdings is Kulczyck Holdings made the

16    payment on behalf of KREH to Innovest bank account in New

17    York.

18          Moving to the mere department doctrine here, Your

19    Honor, under the mere department doctrine courts look at a

20    couple factors to determine if the controlled entity was a

21    shell for the alleged controlling party.  Those factors are as

22    follows.  There exists -- whether there existed a common

23    ownership --

24          THE COURT:  Well, I have them in the briefs.

25          MR. RIGANO:  Okay.

58

1          THE COURT:  So what is it that you want me to take

2    from -- with that doctrine in this context?  How do you

3    connect the dots?  Who is it relevant to and why for purposes

4    of the jurisdictional analysis?

5          MR. RIGANO:  Well, essentially here you have KREH

6    entering into contracts obtaining debt of 14 million dollars.

7    And we have another entity, so it's -- just named Kulczyck

8    Holdings, which is a name in both entities, paying for that

9    debt, paying for Kulczyck KREH's obligations.

10          THE COURT:  All right.

11          MR. RIGANO:  There's clearly a financial dependency

12   between the two parties.  There's ownership between the two

13   parties as alleged in the complaint.

14          THE COURT:  All right.  So for your purposes I could

15   aggregate the context dealing with the real estate company

16   NKH, right, those two entities.

17          MR. RIGANO:  Right.

18          THE COURT:  One is acting on behalf of the other.

19   That -- okay, that -- I understand where you're coming with

20   that.

21          So are there any other applications in your mind of

22   the doctrine to this case?

23          MR. RIGANO:  With respect to Kulczyck Investments,

24   Your Honor, same issue.  Kulczyck Investments list KREH on its

25   website.  I actually have a printout of the website here for

59

1    Your Honor today if you'd like to see it.

2          THE COURT:  Well, but what if -- if KH paid the

3    debt, I understand how they're acting -- taking an action in

4    connection with these transactions, but if they are doing

5    that, then Kulczyck Investments -- so what is it that they

6    would be doing and why would they be -- I mean, maybe somebody

7    is a parent, maybe somebody is a subsidiary, but who cares if

8    they're not involved --

9          MR. RIGANO:  Right.

10          THE COURT:  -- so I don't think a mere department

11   doctrine just captures subsidiaries or parents automatically.

12   It has to be some level of involvement.

13          So what is it that they would -- how would that

14   apply here?

15          MR. RIGANO:  Your Honor, going back to the email

16   exchange between Mr. Sledziejowski and Mr. Kulczyck, as

17   alleged in paragraph 109 of the complaint, Mr. Sledziejowski

18   states to Mr. Kulczyck in the email exchange:

19          "You, of course, are aware that I do not have a

20       negotiating position, but at the same time I can assure

21       you that there shall be no risk related to the potential

22       claims, et cetera, of which KI is afraid because of the

23       discount."

24          KI, presumably Mr. Sledziejowski is referring to

25   Kulczyck Investments.  Clearly, Mister --

60

1          THE COURT:  That's all you've got?  I mean, I don't

2   know what to make of that.  I don't know if Mr. Kulczyck moves

3   his money around.  I have no idea.  I don't know if there was

4   an investment advisor, but did -- do we have anything that

5   they did in any of these transactions?

6          MR. RIGANO:  This is the extent of it, Your Honor.

7   I will say under the mere department doctrine since all the

8   facts relating to this are in defendant's possession, we

9   should take the -- have the opportunity to take jurisdictional

10  discovery to determine whether, in fact, Kulczyck Investments

11  is the mere department -- I'm sorry, KREH is the mere

12  department of Kulczyck Investments.  This taken --

13         THE COURT:  Well, but I'm still -- I'm still -- let

14  me just get the text out in front of me here.

15         MR. RIGANO:  It's page 19 of our --

16         THE COURT:  Thank you.  I think it -- this is

17  talking about asserting jurisdiction as somebody who is -- an

18  entity is a mere department entity over which the court has

19  personal jurisdiction.  So -- but I guess I'm still trying to

20  figure out what it is and maybe we've segued almost into a

21  12(b)(6) kind of argument, but what it is that KI is alleged

22  to have done?  I mean, has KI wronged the plaintiffs, is the

23  question, right?  So I don't know that the mere department

24  doctrine is that fuzzy.  I think it basically says, all right,

25  I know I have jurisdiction over you, but I'm not sure I have

61

1  jurisdiction based on various things over you, a party to the

2  lawsuit because I've made allegations against you, but I can

3  invoke the mere department doctrine because I have

4  jurisdiction over one of you and you're all involved.  I'm not

5  even sure that KI is -- there are allegations here that it's

6  involved.

7       So I mean, I think there's some difference of

8  opinion between the parties as to who actually made the

9  transfer so -- but --

10       MR. RIGANO:  Your Honor, I don't believe there is a

11  difference of opinion with respect to the transfer.  The

12  transfer was made by KH.

13       THE COURT:  KH.  All right.  So I'm just trying to

14  figure out where KI is -- comes into -- is a player here other

15  than another related entity.

16       MR. RIGANO:  So, Your Honor, in the allegations of

17  the complaint the Trustee alleges:

18       "Upon information and belief defendant Kulczyck

19       owns, controls and directs all or substantially all

20       business transactions on behalf of defendant KREH."

21  That's paragraph 42.

22       THE COURT:  Right.

23       MR. RIGANO:  "The Trustee alleges upon information

24  and belief," paragraph 47.  "Defendant Kulczyck owns,

25  controls, directs all or substantially all business

62

1   transactions on behalf of defendant KI; therefore, we have the

2   interlock" -- the finan -- I'm sorry -- "the same common

3   ownership and presence, as well as the corporate formalities

4   between the parties."

5           THE COURT:  That's fine, but I still don't

6   understand that they did anything, so --

7           MR. RIGANO:  Well --

8           THE COURT:  I mean, I get it.  You have an email

9   that says that they're mentioned and maybe you just don't know

10  where they fit into the puzzle.

11          MR. RIGANO:  Well, it's clear that Mr. Kulczyck was

12  negotiating on behalf of Kulczyck Investments and the other

13  parties as well.  There -- it's essentially -- the parties are

14  so intertwined, the Kulczyck parties are so intertwined

15  that --

16          THE COURT:  I've got to say, I'm really -- I'm --

17  that's awfully thin.  That's really awfully thin.  I mean,

18  you -- because you have entities who are named in these

19  agreements and you have entities who have made the transfers

20  and I just -- for jurisdiction you have to say what did they

21  do to avail themselves of the four.  I mean, if Mr. Kulczyck

22  is talking about KI and having musings with them, I don't know

23  that -- it's still been established that they're involved in

24  the transaction, which you need to do for specific

25  jurisdiction.  So that email doesn't do that.

63

1          MR. RIGANO:  Your Honor, taking it back, though, if

2    we could again go back to the discovery point --

3          THE COURT:  No, I understand the discovery point.

4    I'm just trying to figure out what we actually have --

5          MR. RIGANO:  I understand, Your Honor.

6          THE COURT:  -- versus what's aspirational.  And

7    what -- to translate what I hear you saying -- and you don't

8    have to respond to this -- is that you really don't know what

9    much about KI, that they're mentioned in the email and that

10   that's where you find yourself and that's not surprising given

11   that the Trustee has filed this.  It's not a suit brought by

12   the counter-party; it's brought by the Trustee.  So I think I

13   understand.

14         All right.  So what other entities haven't we

15   covered?

16         MR. RIGANO:  I think it's just Mr. Kulczyck himself.

17         THE COURT:  All right.

18         MR. RIGANO:  Mr. Kulczyck was -- negotiated these

19   deals and Mr. Kulczyck came to America to visit

20   Mr. Sledziejowski.  He was the party wearing multiple hats on

21   behalf of all these defendants.  Mr. Kulczyck when it came to

22   pension with Mr. Sledziejowski, Mr. Kulczyck was the one that

23   came up with the MyPlace --

24         THE COURT:  Well, how is the pension account

25   relevant here?

64

1          MR. RIGANO:  I mean, that's general jurisdiction.  I

2   mean, unless you're saying that the pension account is money

3   used to or from somewhere in some of these deals, I don't know

4   that that's -- Your Honor, I do want to focus on specific

5   jurisdiction at this point if we could get to the general

6   point with respect to Mr. Kulczyck in a bit.

7          So take the pension account aside, the fact is that

8   Mr. Kulczyck essentially negotiated, executed, effectuated,

9   consummated all the transactions at issue here on behalf of

10  himself and the various entities.  He was a business partner

11  at MyPlace with Mr. Sledziejowski.  He came to the United

12  States to negotiate these transactions with Mr. Sledziejowski.

13         THE COURT:  Well, I earlier had that he came to the

14  United States for business dealings, but I don't have through

15  this deal.  Do you have that allegation somewhere?

16         MR. RIGANO:  That's the allegation that will -- that

17  would --

18         THE COURT:  All right.  But that's not the same

19  thing.  So I understand this dovetails within discovery, but I

20  mean you've just got to be precise.  I understand you're

21  saying that you don't know precisely what his visits to

22  America were, they have business dealings.  Maybe their

23  dealings over here -- I understand.  All right.

24         MR. RIGANO:  And he entered into at least seven

25  different contracts on behalf of KREH and MyPlace Development

65

1   with TWS Investment Partners seeking the exchange of 12

2   million dollars of debt and then going the other way, 14

3   million dollars caused -- presumably caused a seven million-

4   dollar wire transfer to be made to a New York bank account.

5   These are multi-million-dollar transactions, Your Honor.  This

6   is not a $100,000 transaction.

7          THE COURT:  All right.  But essentially that the

8   allegation in the complaint is that he came to the U.S. for

9   business, essentially.

10          MR. RIGANO:  Correct, Your Honor.

11          THE COURT:  All right.  All right.  I think we've

12   covered a lot of the aggregation and your department issues.

13   Anything else that you want to say on those?

14          MR. RIGANO:  Your Honor, I believe that is all with

15   respect to the specific jurisdiction.

16          THE COURT:  All right.

17          MR. RIGANO:  Your Honor, I would say, though, with

18   respect to general jurisdiction and again bringing it back to

19   the -- to Mr. Sledziejowski's information that he recently

20   provided to the Trustee, Mr. Sledziejowski did recently inform

21   the Trustee that Mr. Kulczyck, in fact, worked in America for

22   at least a year around the time of this critical period.  In

23   fact, Mr. Sledziejowski advised that while --

24          THE COURT:  Well, I don't have any of this in front

25   of me, so here's what I -- I don't know exactly how to do

66

1   this.  I don't want to lead to more back and forth, but what

2   I -- this sort of gets to what I was going to ask you at the

3   end of the personal jurisdiction issue, which is what is it

4   that you think is appropriate discovery; is it discovery of

5   Mr. Sledziejowski, is it discovery of the defendants, is it

6   documents.  You're telling me that there's enough stuff of

7   Mr. Kulczyck being here and mention of his entities, so what

8   is it that you would be asking for?

9          MR. RIGANO:  Essentially, Your Honor, we would be

10  seeking discovery from Mr. Sledziejowski and Mr. Kulczyck on

11  all these issues.

12         THE COURT:  All right.

13         MR. RIGANO:  With respect to their contacts, with

14  Mr. Kulczyck and all the defendants' contacts with America.

15         THE COURT:  All right.  Well, all the contacts with

16  America, that's general jurisdiction, or all the contacts with

17  America as to these deals?

18         MR. RIGANO:  Both, Your Honor.

19         THE COURT:  And your basis for seeking general --

20  essentially discovery in general jurisdiction at this point

21  is --

22         MR. RIGANO:  The fact that Mist -- we have now

23  become aware that -- first off, the relationship between

24  Mr. Sledziejowski and Mr. Kulczyck is such that they were

25  friends for a long period of time.  We've recently learned

67

1   that Mr. Kulczyck worked in America, may own property in

2   America, visited America regularly, took private jets to and

3   from America.  There's a lot of context here that the Trustee

4   just simply doesn't know based on --

5         THE COURT:  All right.  I've got to say, I

6   understand where you're coming from.  It is frustrating to

7   have to deal with this stuff on the fly, as opposed to sort of

8   knowing where you're coming from before we get in here because

9   I went back and looked as to what you asked for, for discovery

10  and it basically just says discovery.  And I -- courts have a

11  lot of discretion on discovery based on my understanding of

12  the law for personal jurisdiction, but I think they're always

13  looking to get guidance from the parties and figure out what

14  is an appropriate way to proceed so that -- because personal

15  jurisdiction is submitting yourself to the burdens of

16  litigation here.  And that's why the scope of litigation --

17  I'm sorry, the scope of discovery that somebody seeks I think

18  is relevant to all of this because it's -- you're submitting

19  somebody to the same burdens they have just for litigation, in

20  which case that's a lot of cases settled because people say,

21  well, now I'm in for a penny, in for a pound; I'm going to

22  have to spend a lot of money.  So I don't think it's supposed

23  to work that way.

24        So do you have any suggestion on how to do this or I

25  guess your answer is what it is and I'll just hear from the

68

1   other side because this is obviously new to me.

2           MR. RIGANO:  Your Honor, we'd seek the same -- take

3   the depositions of Mr. Sledziejowski and Mr. Kulczyck, as well

4   as getting organizational documents with respect to the

5   entities.

6           THE COURT:  All right.

7           MR. RIGANO:  Limited to jurisdiction.

8           THE COURT:  All right.  So -- all right, so I think

9   I have the answer to that.

10          So let's move on to safe harbor and anything else

11  you need to address.

12          MR. RIGANO:  Your Honor, under 146(e) of the

13  Bankruptcy Code a defendant must demonstrate that it

14  transferred itself what sought to be avoided was (a) either a

15  settlement payment or in connection with the securities

16  contract; and (b) may provide to or for the benefit of a

17  financial institution.

18          The way the statute reads and the way the cases that

19  I've seen have interpreted it require the transfer itself so

20  they may provide to or for the benefit of a financial

21  institution.  The only relationship of any financial

22  institution -- that any financial institution has here with

23  respect to the receivable transfer, which is the transfer of

24  debt that TWS Investment Partners to pay KREH is that KH sent

25  seven million dollars to Innovest's Bank of America account.

69

1   The defendant relies on that transfer and asserts that

2   Section 546 applies.  But what the defendant is missing is

3   that the transfer that the Trustee seeks to avoid is not the

4   transfer made by KH to Innovest.  It's the transfer of debt

5   made by TWS Investment Partners to KREH.  The transfer by TWS

6   Investment Partners to KH does not involve any financial party

7   whatsoever.  The transfer is not -- certainly not made by a

8   financial institution as TWS Investment Partners is a private

9   entity.  It was not made to a financial institution --

10          THE COURT:  But isn't it the flip side of the same

11  transaction they transferred the rights to the loan and then

12  they pay them for 50 percent of what the loan balance is?

13          MR. RIGANO:  That is what the transaction is, Your

14  Honor, but a read of the statute does not suggest that that

15  situation falls and is precluded from -- precludes the

16  transfer of debt from avoidance.  The statute states that the

17  transfer itself that is sought to be avoided must be

18  transferred by, to or for the benefit of a financial

19  institution.  That doesn't happen here.

20          And defendants do not cite a single case that

21  support the conclusion that somehow the transfer going the

22  other way precludes the entire transaction from avoidance.

23          Further, Your Honor --

24          THE COURT:  All right.  What's -- what case law

25  would you rely on for that?

70

1            MR. RIGANO:  There is no case law, Your Honor.  This

2    is -- there's no case law that states that a transfer made to

3    a financial institution insulates an entire transaction from

4    avoidance.  The writ of the statute, the circling [ph.] of the

5    statute states that the transfer itself has to have been made

6    to, by or for the benefit of the financial institution.  And

7    courts have construed the terms "for the benefit of" by

8    meaning that the parties to the transaction intended to

9    benefit the financial institution.

10           Parties to the transaction did not mean to benefit

11   Bank of America.  The parties -- the transfer itself

12   certainly, but debt being paid -- being assigned to KREH

13   certainly the parties did not intend to benefit any financial

14   institution, for that matter.

15           Taking a step back, Your Honor, this is simply just

16   a transfer of debt between friends.  There was two private

17   entities, two private individuals and that's it.  It's just

18   that simple.

19           In addition, Your Honor --

20           THE COURT:  Well, I -- I have a problem with that

21   characterization.  We've got a whole bunch of corporate

22   entities that are sued here and parties on each side, so I --

23   you can't -- no one has given me any basis to completely

24   disregard the corporate forum and consider this to be a

25   transaction between Mr. Sledziejowski and Mr. Kulczyck solely,

71

1   so I don't know what you want me to do with that notion of

2   it's between the two friends.  I don't --

3        MR. RIGANO:  Well, Your Honor, it just goes to the

4   point that in this 546(e) case is that the courts discussed to

5   risk these avoidance actions being brought in the financial

6   arena causing ripple effects throughout the global economy and

7   causing a global economic meltdown.

8        THE COURT:  Yeah.  No, I'm aware of that.  I mean,

9   you -- I wrote a lot of its report about this, but I think

10  people agree that it's overbroad and people are debating on

11  how to change it to not capture as much, but I think it's

12  pretty clear that it captures more than a lot of people think

13  it should as of the moment, so I don't know that I can

14  necessarily ignore the language of the statute, even if -- you

15  know, under the guise of saying it's all about systemic risk,

16  as tempting as that is.

17       So do you rely on any particular cases that you want

18  me to look at for purposes of how to construe the statute the

19  way you want me to construe it?

20       MR. RIGANO:  Your Honor, I'm not sure that the cases

21  discuss this issue.

22       THE COURT:  All right.

23       MR. RIGANO:  This particular issue.  So

24  unfortunately, I'm not sure that we could provide guidance,

25  Your Honor, in that matter.  But again, I would refer to the

72

1    strict reading and interpretation of the statute where the

2    statute does state that the transcript that is precluded from

3    avoidance is the transfer made by, to or for the benefit of a

4    financial institution.  It doesn't say the entire transaction

5    is precluded from avoidance.  It says the transfer.

6             THE COURT:  All right.

7             MR. RIGANO:  In addition, Your Honor, the defendant

8    states this is a settlement payment for payment made, the

9    payment of debt by TWS Investment Partners.  The Trustee

10   disagrees for a couple of reasons.  First off, the defendant

11   cites no case supporting the conclusion that the agreement

12   itself -- the transfer of debt itself could be considered a

13   settlement payment.  Settlement payments have been construed

14   by courts to mean actual payments of cash and defendant cite

15   cases supporting that conclusion in their brief.

16            Secondly, Your Honor, a settlement payment suggests

17   some kind of conclusion to a transaction, settling a

18   transaction.  What Mr. Kulczyck stated that to

19   Mr. Sledziejowski that "I will compensate your losses" in that

20   email exchange, it's clear that Mr. Kulczyck and

21   Mr. Sledziejowski did not intend for this to be a settlement

22   payment.  It was just a payment on account.  There was a

23   future payment to be made later.  And I know this is not

24   before Your Honor, but Mr. Sledziejowski has informed the

25   Trustee that after the fact, after --

73

1          THE COURT:  Can you cite to anything in the

2   agreement that provides for that?

3          MR. RIGANO:  The agreement themselves, no, Your

4   Honor, but the email -- the --

5          THE COURT:  I know, but I don't get -- I don't get

6   to an email as evidence of what a contract says unless the

7   contract -- unless there's certain requirements met, the

8   contract is ambiguous, right, you read the contract first if

9   you can make -- make heads or tails of it in terms of what

10  it's supposed to provide.  Intrinsic evidence is -- there has

11  to be a reason to go to intrinsic evidence.

12         So what -- is -- are you making a pitch on that?

13         MR. RIGANO:  Well, Your Honor, this is a -- this is

14  not a breach of contract claim.  This is a Chapter 5 avoidance

15  claim.  And so under Chapter 5 --

16         THE COURT:  I know that, but it's -- but you just

17  said that the agreement contemplates additional payments, so

18  you can't have it both -- you can't have it both ways.  I

19  mean, so I have to deal -- you keep saying it's not a contract

20  case, but it's all about the transactions that are governed by

21  these agreements and then things happen consistent with those

22  agreements.

23         So I don't know that you can take all the agreements

24  and throw them out and say it is whatever it is.  I --

25         MR. RIGANO:  Your Honor, I think it's different in

74

1   this case because this is -- again, this is a fraudulent

2   transfer action.  So the critical inquiry is -- one of the

3   inquiries is the bar in the position of the parties and what

4   the parties expected to be exchanged and otherwise.  And here

5   what the parties expected to be exchanged is set forth in

6   those emails.  This is not the matter of an interpretation of

7   a --

8           THE COURT:  So when I'm construing a settlement

9   payment, I -- you're allowed to recast the agreement however

10  you -- based on the allegations of the complaint?

11          MR. RIGANO:  Well, I think the intention of the

12  parties is important when determining whether payment is a

13  settlement or not.

14          THE COURT:  All right.  All right.  Let's -- I think

15  we can being to wrap it up.  Anything else that you need to

16  address?

17          MR. RIGANO:  Well, with respect to 546(e), Your

18  Honor, I would just point out that the defendants do not

19  appear to assert that 546(e) applies to the equity transfer

20  and Mr. Kulczyck's interest in KREH nor do they, I think

21  anyway, assert that the Innovest transfer of 1.3 million

22  dollars to MyPlace Development is insulated by 546(e).  And so

23  we don't believe that 546(e) applies to the release of

24  transfers as well.

25          As for turnover, Your Honor, I think we mentioned

75

1 earlier the Trustee believes that the transaction was never

2 consummated.  With respect to the equity transfer, the

3 agreement was not signed by Kulczyck, but -- KREH anyway.  The

4 agreement does not appear to have been consummated because no

5 payment was ever made.  For those two facts we believe that

6 Mr. Sledziejowski is the holder of a 25 percent equity

7 interest in MyPlace Development and the Trustee has a right to

8 assert turnover of that equity interest under the complaint.

9        And finally, Your Honor, I just want to touch on the

10 TWSIP issue the defendant has raised.  Under defendant's

11 theory essentially TWS Investment Partners cannot be sued

12 because of the Delaware Secretary of State issued a

13 certificate of cancellation.  However, as stated in our brief

14 under Section 18, 1107(m) of the Delaware Code, the Delaware

15 statute permits entities to be sued, defendant selfing suits

16 [ph.].  It doesn't void any contracts.  Talks about all the

17 different things that were not effected, do not effect an

18 entity that fails to pay their franchise taxes to the Delaware

19 Secretary of State.

20        It's undisputed that the sole reason why the

21 Delaware Secretary of State issued the certificate of

22 cancellation on TWS Investment Partners is because TWS

23 Investment Partners failed to pay its franchise taxes.  In

24 addition, I'm not sure what defendant said he needs to assert

25 and he claims on behalf of -- or defense on behalf of TWS

76

1  Investment Partners.  And finally, Your Honor, if it truly is

2  a huge issue, the taxes, I'm sure the Trustee can arrange for

3  the payment upon a proper application to Your Honor of the

4  taxes that are due and owing.  I believe there's something in

5  the nature of less than $2,000.

6        THE COURT:  All right.  Thank you very much.

7        MR. RIGANO:  Thank you, Your Honor.

8        MR. NEIER:  Very briefly, Your Honor.  When you make

9  an investment in a company overseas that obviously does not

10 creating jurisdiction here in the United States.  If I make an

11 investment in a completely different foreign entity, I got to

12 Poland but I make an investment in a Polish entity, that's not

13 going to be governed in the United States just because I am a

14 U.S. citizen and I made that investment.

15       The going case, which Mr. Rigano cites, was

16 investments here in the United States.  And as far as the

17 investors knew, it was investments in U.S. stocks that were

18 going to be made.  Of course, Mr. Madoff had other plans for

19 the money, but that was the intent of those investments.

20       Burger King was a franchise relationship for 20

21 years.  The Deutsche Bank case is a New York long-arm statute

22 case, really not relevant to this debate, but it's a New York

23 long-arm statute case from 2006 so it might be effected by

24 Walden.  As I said earlier, if Walden has any change in laws

25 it's that the long-arm statute might be impacted there.

77

1          THE COURT:  Is that a doing-business case?

2          MR. NEIER:  It's a doing-business Montana -- I

3    believe it's a Montana entity that is the purported defendant

4    there.  It's not even a case involving foreign entities.

5          The sheriff sale agreement -- so the sheriff sale

6    agreement, which is attached to the Elkin deposition -- or

7    excuse me -- sorry, the Elkin declaration, it's true we don't

8    have an executed copy.  We provided it to bring it to the

9    Trustee, by the way, and this is the copy that we have.  We

10   can look for other copies with a signature, but I would just

11   point out, it's an agreement.  It sells the equity for 2,500

12   zlotys.  It says, zloty.  If you have a problem, the agreement

13   is governed by the laws of Poland.  There's a consent to

14   jurisdiction in Poland and the agreement, in essence, could be

15   signed today.  We have 2,500 zlotys to the Trustee and the

16   matter would be over.  The Trustee stands in the shoes of the

17   person contracted for this, so it's not like they can undo the

18   investment.

19         And by the way, I'd just point out to the Trustee, I

20   don't know a lot about the history of Mr. Sledziejowski.  I

21   think the Trustee and the Court probably have a lot more

22   history than we do, but if Mr. Sledziejowski's investments

23   really resulted in a windfall this would probably be

24   unprecedented compared to his other dealings.

25         THE COURT:  Now, I don't know what that gets me.

78

1   What about the Trustee's position here today about discovery

2   based on things Mr. Sledziejowski has said about trips to the

3   United States and things of that sort?

4           MR. NEIER:  Well --

5           THE COURT:  If -- I understand you do not want

6   jurisdictional discovery, but --

7           MR. NEIER:  That's correct, Your Honor.

8           THE COURT:  -- but humor me for a second and say

9   that if for one, what's your response to the request for

10  jurisdictional discovery of the type discussed here today;

11  and, two, if some discovery were to go forward on his contacts

12  with the U.S., what should it look like.  Again, I realize

13  it's --

14          MR. NEIER:  Right.

15          THE COURT:  -- kind of a loaded question, which is

16  to say, I don't agree, I don't agree, but if you did agree

17  what would it look like.  So I -- you can take the Fifth on

18  the second one, if you want.

19          MR. NEIER:  Not take the Fifth.  So I think Your

20  Honor noted in the <u>Arcapita</u> case that jurisdictional discovery

21  is not necessarily the way to go, but if you were to go that

22  way, then Mr. Sledziejowski is obviously subject to the

23  jurisdiction of the Court.  And if the Trustee wants to notice

24  a deposition, then with respect to jurisdiction I suppose we

25  could attend that.

79

1          But with respect to the other defendants they are

2   not resident here in the United States and the Trustee would

3   have to obtain discovery of them overseas in order to do that

4   jurisdictional discovery.  As you noted earlier, it's not fair

5   to take foreign entities and individuals and subject them to

6   the burdens of U.S. litigation when they haven't consented to

7   the jurisdiction of this forum, nor have they had minimum

8   contacts and the Trustee is now seeking to discover minimum

9   [ph.] conducts.

10          THE COURT:  Right.

11          MR. NEIER:  It's inherently unfair to make them

12   appear -- to -- it's one thing to appear here through lawyers

13   and argue personal jurisdiction; it's quite another thing to

14   make them subject to the burdens of U.S. discovery so the

15   Trustee could discover jurisdiction --

16          THE COURT:  Well --

17          MR. NEIER:  -- so that discovery should take place

18   overseas --

19          THE COURT:  But again, to use --

20          MR. NEIER:  -- if it takes place at all.

21          THE COURT:  To use --

22          MR. NEIER:  Nor do I think it's fair for them to

23   happen at all.

24          THE COURT:  Yeah.  Well, I guess my thought is, if

25   discovery were to happen it would have to be limited, so if it

80

1   were to be limited in order to address some of the concerns

2   you've raised, how should it be limited?  In your mind, would

3   the -- would there be documents that could be provided, is

4   there -- and maybe you want to think about it before you

5   answer that question.  I --

6           MR. NEIER:  I think you are correct, Your Honor,

7   when you said that this is on the fly.  And it's not in

8   writing, so obviously I'd have to take back any request of

9   proposal to the clients to find out what there is.  We have

10  provided documentary evidence to the Trustee.  All the

11  documents that are in the Elkin declaration are documents we

12  provided to the Trustee upon request --

13          THE COURT:  Right.

14          MR. NEIER:  -- from the Trustee, so --

15          THE COURT:  No, I know but oftentimes and certainly

16  was the case in Arcapita where there was a declaration from

17  defendant that said, we just want to make it exactly clear

18  how -- what the context or lack thereof are with the United

19  States.  And so you had a declaration that said amount of

20  offices in the United States, zero; amount of time spent in

21  business and -- you know, it says zero.  There were some

22  statements that -- you're not required to do that, so I'm not

23  trying to say that.  But when thinking about the issue of

24  discovery it certainly is somewhat relevant and it makes it --

25  I think it's a factor the courts consider in deciding what

81

 1   they should do on a request like this.  So --

 2           MR. NEIER:  I appreciate that, Your Honor.  And I

 3   would certainly take back any suggestion -- it's still on the

 4   fly -- but take back any suggestion to the clients.  But I --

 5   you know, I would point out that there's a big difference as

 6   to when you submit a declaration now the Trustee is asking for

 7   depositions.  That's a --

 8           THE COURT:  No, I --

 9           MR. NEIER:  -- entirely different --

10           THE COURT:  I recognize that, but I think people

11   sometimes submit declarations just because they don't want to

12   have to deal with discovery, right?

13           MR. NEIER:  Right.

14           THE COURT:  So, again, you're not required --

15           MR. NEIER:  We didn't do that here.

16           THE COURT:  You're not -- no, you're not required to

17   do it but it does -- people do it.  It's a strategic question

18   as to whether you want to do that or not and, you know, if I

19   don't have them, I don't have them and I just consider it

20   without it.

21           So here's what I'd like to do on that point is I'd

22   like to ask the Trustee to submit a letter in the next week

23   that says just for purposes of the record because, again, I

24   don't think I have a request on the record for the -- with the

25   specificity of what you're talking about today in terms of

82

1   what Mr. Sledziejowski said and your basis for it.  Letter

2   can't be any longer than two pages on the issue of what you

3   think should happen to discovery if that's the path that I

4   take.  And then I'll give you a week to respond to it and then

5   that way people have a chance to think about what they want to

6   do.  They even have a chance to have a discussion to the

7   extent that people say, Judge, we don't think you need to get

8   there, but if you do this is what the parties have worked out.

9   I mean, there's lots of different ways to do it in strategic

10  considerations to go into all that, so I don't want to put

11  anybody on the spot.

12          And I did put you on the spot, so this way you get a

13  chance to think about it a little bit more.  And if you want

14  to refine it a little bit more, tweak it, your request for

15  discovery, you can do that as well or you can stand by what

16  you did today and just repeat that.  That's fine.  But --

17          MR. NEIER:  Well, I will just finish up, Your Honor,

18  by saying the Trustee did say in its opposition that it could

19  give rise to a mere department doctrine.  It didn't actually

20  assert the mere department doctrine, as it is here today, and

21  they quite the Lehman case where the court said -- this is

22  Judge Chapman's case, I should say -- "A court may assert

23  jurisdiction where there's a subsidiary amenable to

24  jurisdiction that is a mere department of the parent defendant

25  or where there's a subsidiary depart -- defendant that is a

83

1  mere department of a parent amenable to jurisdiction."  We can

2  go through all the discovery you want, but at the end of the

3  day there is no subsidiary of Kulczyck that is in the United

4  States of the Kulczyck -- the investments Kulczyck opens KREH

5  entities.  I don't think -- and I don't think Mr. Kulczyck has

6  any children, so they can't be subsidiaries either.

7       The Trustee also says that under 546(e) we didn't

8  assert that the sheriff sales agreement was covered by 546(e).

9  We did assert that.  It's in our opposition brief.  The

10 beginning of it -- the first sentence of our opposition

11 brief -- sorry, in our motion to dismiss, not our

12 opposition -- in our motion to dismiss was the allegations in

13 Counts II through XVI of the amended complaint brought under

14 state law by the Trustee and the Trustee's strong-arm powers.

15 All of those claims should be dismissed.

16      We later say in that -- in that section on page 10

17 of our motion to dismiss, the agreements per Simon and sale of

18 the debt and equity investments in MyPlace constitute

19 securities contracts and then we go on to discuss 546(e).  So

20 we did move to dismiss what was -- with respect to the sheriff

21 sale agreements and with respect to the debt agreements.

22      With respect to the -- I think what Mr. Rigano has

23 conceded as a novel claim and we certainly couldn't find any

24 cases on it when we looked, but Mr. Rigano did refer to the

25 plain words of the statute under 546(e).  I just want to make

84

1    the Court -- or I just want to point to the plain words.  The

2    statute says -- refers to a transfer made by or to or for the

3    benefit of.

4          Now, for the benefit of -- obviously this is not for

5    the benefit of Bank of America, but it was made to Bank of

6    America.  And the <u>Krepacore</u> [ph.] cases and the <u>Enron</u> cases

7    and all those other cases say that the financial institution

8    is a mere conduit.  It just receives the transfer.  That's

9    enough.

10         And then Mr. Rigano says, but the transfer of the

11   debt is what we're suing for.  We're not transferring -- we're

12   not suing for the consideration paid for the debt.  The

13   statute reads a transfer made by or to or for the benefit of

14   and then it says, "in connection with the securities

15   contract."

16         Now, "in connection with a securities contract" I

17   could buy plenty of cases that talk about that because

18   obviously every [indiscernible] case is in connection with a

19   securities contract, every payment made in connection with a

20   securities contract there is, in fact, quite a bit of law that

21   would say that a payment made in connection with a securities

22   contract is something that we're talking about.

23         So the plain words of the statute are not in

24   Mr. Rigano's favor.  They, in fact, go the opposite way

25   because if you make a transfer to an institution in connection

85

1  with a securities contract, that's it.

2          And I don't have any further points, Your Honor.  If

3  you have any questions --

4          THE COURT:  No, I do not.  Thank you very much and I

5  appreciate everyone's response to questions.  Obviously, those

6  are things that I am working my way through.  Sometimes I

7  ultimately have a point and I'm onto something.  Sometimes I'm

8  not, but the reason we're asking the questions are to get a

9  response --

10          MR. NEIER:  I forgot one thing I should add.  The

11  two -- the motions to dismiss that are before Your Honor,

12  there is no breach of contract, breach of the sheriff's sale

13  agreement before Your Honor.  So when Mr. Rigano said, we're

14  suing for return, that's not before Your Honor in this motion

15  to dismiss.  There's no breach of contract action here.

16          MR. RIGANO:  Your Honor, certain turnover.  The --

17          MR. NEIER:  Yeah, turnover, but  --

18          MR. RIGANO:  It was not consummated.  That's the

19  Trustee's allegations.

20          THE COURT:  Right.

21          MR. RIGANO:  As well as --

22          THE COURT:  I got it.  I don't expect agreement on

23  how to characterize it.  That's a bridge too far for today.

24          MR. NEIER:  Your Honor, just because next week is

25  Thanksgiving can you give us one week to file the letter?

86

1          THE COURT:  That's fine.  Just work out a schedule

2  amongst yourselves.  Anything that's reasonable is fine with

3  me.  Just call chambers and let me know when it is.  That's

4  fine.

5          MR. NEIER:  Okay.

6          THE COURT:  But I don't want to be the reason anyone

7  has to explain to a significant other that you can't help set

8  the table at Thanksgiving because you're writing this letter.

9  That's not a good place to be, so let's not go there.

10          So that's fine.  Just work it out.  Whenever you

11  submit it, yours is a week later and just pick a date.  That's

12  fine.  All right.  Thank you very much for the arguments.  I

13  thought they were very helpful.

14          ATTORNEYS:  Thank you, Your Honor.

15  (Proceedings concluded at 12:57 p.m.)

16                        * * * * * *

17

18

19

20

21

22

23

24

25

87

1    I certify that the foregoing is a court transcript from

2 an electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5

6            RUTH ANN HAGER, C.E.T.**D-641

7 Dated:  November 27, 2015